The People of the State of Illinois, Plaintiff-Appellee, *v.* James M. Mann, Defendant-Appellant.

(No. 72-255;

Third District—July 30, 1975.

Winston J. Block, of Cirricione, Block & Krockey, of Joliet (Robert M. Gray, of counsel), for appellant.

Martin Rudman, State's Attorney, of Joliet (Richard Orloff, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE ALLOY delivered the opinion of the court:

A Will County jury found defendant James M. Mann guilty of the rape and murder of Dorothy Ross in Romeoville, Illinois. Judgment was entered on the verdicts and defendant was sentenced to serve a 25- to 50-year sentence in the penitentiary for the rape and, following that, to serve a consecutive 100- to 150-year term for the murder of Dorothy Ross.

On appeal in this court, defendant contends (1) that he was deprived of a fair trial by the introduction of probability evidence pertaining to a pair of eyeglasses found at the scene of the crime; (2) that certain statements made by him to interrogating officers were improperly admitted into evidence; (3) that the evidence was insufficient to support both convictions; and (4) that the sentences are excessive.

The record discloses that defendant was a 20-year-old corporal in the Marine Corps at the time of the incident in question, on September 27, 1971. He was married and had one child with another due in several months. Following service for about 2 years in El Toro, California, Mann came home to his parents' house in Romeoville, Illinois, in August 1971, for a several weeks' leave. He was due back at the Travis Air Force Base on September 29, 1971, for transfer to Japan.

The victim, Dorothy Ross, was a 28-year-old housewife who lived with her husband and child in a house almost directly across the street from the home of defendant's parents. The Rosses had moved there in the summer of 1968, just a couple of months before James Mann entered the Marine Corps.

On the evening of September 27, 1971, the victim's husband, Dennis Ross, left his house about 9:30 p.m. to visit a friend of his. When Ross returned home shortly after 1 a.m. he found most of the lights in the house on. He called to his wife but heard no response. He heard water running in the bathroom, where he found his wife laying unconscious on the floor. Her legs were straddling the commode. The lower part of her body was completely nude and there was only a bra and sweater

wrapped around her upper chest. She was bleeding from cuts in the region of her left breast and there was blood and water all over the rest of the bathroom while water was running in the bathtub.

Ross stood there in shock briefly and then ran to a neighbor's for help. The police officer, who arrived at the scene, sought to aid the victim, and she recovered consciousness sufficiently to tell him, "A man, a man, he stabbed me, he raped me, he stabbed me." Mrs. Ross apparently did not regain consciousness thereafter. She was taken to the hospital, but she died on October 5, 1971, as a result of her wounds.

Testimony on behalf of defendant was to the effect that early in the evening of September 27, 1971, defendant Mann and his family had traveled to Wilmington, about 45 minutes away, to visit his sister and brother-in-law. The family returned to Romeoville that evening, but defendant remained at his sister's house for some time. His sister and brother-in-law stated that they brought him home and arrived at approximately 12:30 a.m. at the Mann home. According to original statements made to authorities and his testimony at the trial, defendant stated that he stayed at home doing some wash, playing solitaire, and drinking a couple of beers until he fell asleep. He testified that he arose around 7 a.m., took his younger brother to school later, got a haircut, and then finished packing. In midafternoon his father took him to O'Hare Airport, where he boarded a flight standby to San Francisco at 4 p.m. Mann was questioned briefly by a Marine investigator at Travis Air Force Base concerning the crime but he continued on to Japan to join his unit.

In November, after Mann's unit was transferred to Subic Bay in the Philippines, Mann was questioned extensively by officers of the Naval Investigator Service. In 5 hours of interrogation, extending over a period of 2 days, he denied any knowledge of or participation in the crime relating to Mrs. Ross. At the end of the interrogation, however, when asked if he could say he had nothing to do with the killing of Mrs. Ross, he did not reply directly but stood up and said he was tired, wanted to get something to eat, and wanted to think it over and continue the interviews the following day. While one of the officers took him back to his barracks, Mann made some inquiries of the officer by asking the representative whether he would be eligible for bail, what would happen to him if he confessed, and what would happen to him if he were sent to prison. He also inquired whether he could get out on bail after being returned to Illinois and whether he could continue his education in prison. This evidence was introduced at the trial over defense objections.

Defendant was returned to Joliet for trial, which began on June 19, 1972. The major evidence introduced against defendant was a pair of

eyeglasses which were found in the bathroom near the victim. The glasses were of military issue and were the same prescription as those worn by defendant. Over defense objection, the prosecution produced an optometrist, who testified as to the odds against glasses of defendant's prescription being prescribed for someone else, as amounting to an astronomical figure of approximately one to four trillion. In addition to the eyeglasses, as we have noted, the statement made by defendant to the Naval intelligence officer was introduced. Prosecution witnesses also testified that semen and hair samples found in the Ross home could have come from James Mann and not from Mr. Ross and, also, that a knife found in his possession in the Philippines could have caused the wounds which were noted in the body of Mrs. Ross.

The probability aspect of the testimony was developed in the trial, when the State called in an optometrist, Dr. Jess Goroshow, as an expert witness. He testified as to the various characteristics of eyeglasses, including lens measurements and frame sizes. He concluded that the probability of finding a particular combination of the various factors in two individuals would be very remote. He specified astronomical figures by using computation of the combination of all the various factors in glasses with defendant's prescription. The eyeglasses found at the scene of the crime were introduced in evidence as well as those taken from defendant during his interrogation in November 1971. The expert witnesses both testified that the glasses were basically identical in measurements for each of the many factors referred to by the experts. Apparently, defendant did not object in the trial court on the ground of lack of foundation for the testimony in connection with the probability of two persons having the same prescription for measurements of eyeglasses, but simply raised the issue that the province of the jury was invaded by the witness scientifically resolving that the eyeglasses found in the Ross bathroom most probably were those of defendant.

■■ Evidence of this type in any event would be received for what it is worth, regardless of whether there is an objection (*Knudson v. Knudson* (1943), 382 Ill. 492, 499, 46 N.E.2d 1011). Both optometrists expressed their expert opinion, in addition to the discussion of the probability evidence, that the glasses found at the scene of the stabbing and those taken from James Mann during the interrogation, in all probability, belonged to the same person. The coincidence of a pair of military-issue eyeglasses fitting James Mann's prescription, given the admitted fact that he was in the neighborhood at the time of the incident, could properly be received in evidence. Whether or not the probability formulas were accurate in establishing the astronomical figures referred to, it is clear from the evidence that it is very unlikely that there could be an

individual wearing the same prescription of military-issue eyeglasses in the neighborhood. The issue, therefore, was one for the jury to resolve, from the evidence which was presented.

■■ Defendant also challenges the introduction of his statements to the Naval investigators and states that, at best, his admissions by silence or "tacit admission" were admissible only against an accused in limited circumstances. (*People v. Aughinbaugh* (1967), 36 Ill.2d 320, 322-23, 223 N.E.2d 117). The State, however, notes that the defendant did not remain silent in face of the question. What he did, actually, was to change the subject. We find no reversible error in admitting his response, and the jury could properly consider the nature of the statement and the context of the entire interrogation and defendant's previous consistent denials of complicity in the crime.

Defendant also attacks the admissibility of his questions to one of the interrogators, concerning bail and possibility of education in prison on grounds of relevancy. He contends, in face of the picture of guilt that the interrogators painted, that it would not be unusual for an accused to ask such questions, even if he were innocent, and that, therefore, his inquiry would have no bearing on the issue of guilt or innocence. There was no objection to the introduction of this testimony at the trial on the ground of relevancy. Therefore, for the purpose of review on appeal, this issue was waived. (*People v. Scott* (1972), 52 Ill. 2d 432, 439-40, 288 N.E.2d 478, *cert. denied*, 410 U.S. 941.) The arguments raised by defendant go to the weight of the evidence rather than to its admissibility.

Defendant also challenged the admission of his statements on the ground that the investigators made intentional and material false statements and misrepresentations of fact. While it appears that there may have been some statements which could be so characterized, other statements complained of by defendant were only as to possibilities raised by the Naval interrogators, which, on the basis of the evidence known to them at the time, may either have been true or possible, including the possible existence of an eyewitness. On the basis of a review of the transcript of the questioning, which was played from tapes for the jury, and from the testimony of the interrogators at the trial, any deception was not such as was likely to produce untrustworthy statements from defendant or be reprehensible and offensive to basic notions of fairness.

■■ Defendant generally challenges the sufficiency of the evidence to support the convictions. As to the murder, the evidence against defendant consisted of the following elements: (1) the statements of the accused to which we have just referred; (2) the admitted fact that he was in the area at the approximate time of the commission of the offense;

(3) the discovery of a pair of military-issue eyeglasses by the victim's body with the same prescription as those worn by defendant; (4) the discovery of hairs, blood, and semen which could have come from defendant based on tests; and (5) the discovery of a knife in his locker which could have made the wounds found in the victim's body.

The evidence on behalf of defendant consisted generally of his testimony that he stayed in his parents' house and did not go outside; that he had only one pair of eyeglasses (besides his sunglasses) at the time of the incident and that he had thrown his others away as useless a few weeks before leaving El Toro. While some of the factors to which we have referred, the hairs, blood, semen and the knife, might have been of relatively little probative value standing alone, we believe that the evidence as a whole, though circumstantial, was sufficient to sustain the finding of guilt of defendant by the jury.

■■  Defendant contends that the rape conviction and sentence could not stand since the rape and murder were part of the same "transaction." We believe that this contention is consistent with the precedents in this State. The only evidence as to the rape issue was a statement of Mrs. Ross to the police officer in which she recited that "A man, a man, he stabbed me, he raped me, he stabbed me" showing, so far as the record would disclose, one apparent violent transaction. In accordance, therefore, with the precedents of *People v. Lilly*, 56 Ill.2d 493, 309 N.E.2d 1, *People v. Duszkewycz*, 27 Ill.2d 257, 189 N.E.2d 299, and *People v. Schlenger*, 13 Ill.2d 63, 147 N.E.2d 316, the conviction and sentence with respect to the rape charge is required to be vacated. Where a jury finds a defendant guilty of two charges arising from the same transaction, the defendant so charged should be convicted and sentenced for only the greater offense, which in the present case is murder.

■■  Defendant makes the final contention that the sentences are excessive. We have already indicated that the rape sentence is required to be vacated. Defendant contends that the sentence fails to reflect his prior history and character, and fails to meet the constitutional statutory goal of rehabilitation. The past history and character of defendant are relevant in determining whether to impose a sentence higher than the minimum. In this case, defendant showed no prior criminal record, and a good, if not outstanding, service record in the Marines. The nature and circumstances of the offense, however, are also relevant considerations. The brutal attack, rape and murder of a young housewife in her own home, alone could justify the sentence for murder imposed in the instant case. In reviewing a request for reduction of sentence we must determine whether or not the trial judge failed to exercise sound discretion in imposing the sentence. The issue is not what we might have done

514

had we been presiding as judges. On the basis of the record, we find no failure on the part of the judge to exercise sound discretion in imposing the sentence.

For the reasons stated, the conviction and sentence for murder are affirmed and the conviction and sentence for rape are reversed and vacated.

Affirmed in part and reversed in part.

STENGEL and BARRY, JJ., concur.