THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DUANE ALLAN SCHULZ, Defendant-Appellant.

First District (3rd Division)   Nos. 84—1476, 85—2153 cons.

Opinion filed March 18, 1987.

Arthur J. O'Donnell and Mary E. Gentile, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter Fischer, Dana Crowley, Thomas V. Gainer, Jr., Bonnie Meyer Sloan, and Frank Savaiano, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial, defendant, Duane Allan Schulz, was convicted of the offense of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) and sentenced to a term of 40 years in the Illinois Department of Corrections. Defendant appeals his conviction, contending: (1) the

trial court erred in denying his pretrial motion to exclude the results of the State's blood and enzyme testing; (2) he was not proved guilty beyond a reasonable doubt where the proof of the crime was based upon the testimony of an admitted perjurer; (3) based upon the grand jury testimony of the prosecutor, the court erred in not dismissing the indictment, and (4) the court erred in admitting into evidence irrelevant and prejudicial information which denied him a fair trial. Defendant also appeals the dismissal of his post-trial petition, in which he alleged he was denied a fair trial due to discovery violations by the State.

Defendant was indicted by a grand jury and charged with the murder, deviate sexual assault, and aggravated kidnaping of Theresa Kaminski, his former girlfriend. A visitor to a cemetery in Willow Spring, Illinois, found the victim's body on February 21, 1981. The Cook County medical examiner conducted an autopsy and determined that the cause of death was by ligature and manual strangulation. He also found contusions and lacerations of the vagina and anus.

A police investigation into the facts of the incident revealed that on February 15, 1981, the victim had Sunday dinner with her family at the home of her aunt. After dinner, she drove to defendant's home, where she arrived between 6 p.m. and 6:30 p.m. She and defendant went to his bedroom. There was conflicting testimony as to whether their activity in that room was "horseplay" or an argument between the victim and defendant. Defendant's brother and his friends were in the home at the time, initially in the bedroom next to that of defendant and later in the family room in a different part of the house. Each of them testified that a plaque outside defendant's bedroom fell off the wall as a result of the activity.

None of the visitors in the home that evening could say that they actually saw the victim leave defendant's house. However, there was testimony that the victim came into the family room at approximately 8:15 p.m. or 8:30 p.m. to say good-bye to the guests. Defendant testified that he and the victim went to get cigarettes at a nearby store, and she dropped him off at home afterwards. He stated that he then went to a bar where he planned to meet some friends. Although he found the bar closed, defendant waited to see if his friends would arrive so that he could get a ride home. Defendant explained that while he was waiting, a man approached and asked if he was Duane Schulz. When he replied that he was, the man hit him and he hit the man back and ran. Defendant claimed that he received scratches on his hand from the fight, but he could not recall

how he got the scratches on his face. He arrived home at approximately 9:45 p.m. and found his brother, Ray Lees, and Ray's girlfriend, Jeri Lynn Myers, preparing to leave. Defendant stated that he told them about the fight with the unknown man at the bar.

On Tuesday, February 17, 1981, the victim's mother informed the police that her daughter was missing and that her car was parked behind the family home. The police came to the home, where they inspected the vehicle as part of their investigation. In the trunk they found the victim's purse and miscellaneous items. The car keys were never located. The victim's mother told the police that she thought she heard her daughter come in the house at approximately 2 a.m. on February 16, but she never got up to verify the fact. The victim's brother stated that he saw his sister's car near a telephone booth at a gas station at about 9:15 or 9:30 p.m. on February 15. Although he saw someone in the car, he could not identify who it was. The victim's body was discovered on February 21 at a cemetery in Willow Springs, Illinois.

Approximately 1½ years later defendant was charged by grand jury indictment with murder, deviate sexual assault, and aggravated kidnaping. The trial commenced on March 21, 1984. At the close of the State's case, the defense moved for a directed verdict on all counts. The court granted the motion as to the aggravated-kidnaping charge and denied it on the murder count. The court initially denied the motion as to the deviate-sexual-assault count, but later granted a directed verdict on it as well during the jury instruction conference. The jury, therefore, was instructed only on the murder count. The jury returned a verdict of guilty, and defendant appeals.

■ Defendant first contends that the trial court erred in denying his pretrial motion to exclude the results of the State's blood and enzyme testing. He claims that the scientific test results were devoid of probative value and irrelevant and, therefore, should have been held to be inadmissible. Defendant additionally argues that the testimony of the State's expert unconstitutionally shifted to defendant the burden of proving his innocence.

Approximately three weeks after the victim's body was discovered, defendant voluntarily went to the Willow Springs police department and gave them hair, saliva, and blood samples. Mr. Michael Podlecki, a forensic serologist with the Illinois Department of Law Enforcement, tested defendant's blood and saliva samples. He also tested samples from the victim, including a liquid blood sample; oral, vaginal, and rectal swabs; and Kool and Virginia Slims cigarette butts. Podlecki determined that both defendant and the victim had

blood types of ABO type O, Rh positive, MN factor, type MN, and PGM type 1. The tests revealed that the victim was a secretor, that is, her blood type was evident in her bodily secretions. The tests also revealed that defendant was a nonsecretor. Podlecki testified that secretors include 80% of the population, whereas 20% do not secrete a blood type. He could not determine a blood type from the semen found in the rectal area and concluded that the semen was either from a nonsecretor or that the antigens used to determine blood type, if present, had deteriorated. He did not find seminal material on the vaginal swab. Podlecki was permitted to testify that, based upon the results of his testing, defendant could not be excluded as the possible source of the seminal fluid on the rectal swab.

Mohammed Tahir, another forensic serologist with the Illinois Department of Law Enforcement, also testified for the State. He explained that he received three exhibits from Mr. Podlecki: a blood sample from defendant, a blood sample from the victim, and a rectal swab from the victim. He performed a blood grouping test on the blood samples and determined that both defendant and the victim were "Gm plus 1 minus 2." His test of the rectal swab revealed the same grouping. Mr. Tahir also testified that none of the tests he performed excluded defendant as the possible source of the seminal fluid found on the rectal swab.

Brian Wraxall, a forensic serologist from California, testified for the defense. He explained that he had performed absorption inhibition and absorption elusion tests upon the rectal swab which he received from Podlecki and Tahir. Wraxall stated that he found ABO type A on the swab which, he explained, could not have originated from the victim because she was type O secretor. Because it is possible that spurious results can occur due to the presence of large amounts of bacteria, Wraxall tested for its presence. He did not find such amounts. He indicated that assuming that the type A he detected originated from the semen on the rectal swab, the semen could not have come from defendant. Wraxall testified that although his test results would not exclude defendant 100% as the donor, he did as many tests as he could to rule out spurious results.

Defendant argues that the value of the State's physical evidence here lay only in the fact that it failed to exclude him as a suspect and, therefore, it was irrelevant and inadmissible. He maintains that such evidence must be connected to both the defendant and the crime to be admissible, with the inquiry being one of relevance and not weight. (*People v. Free* (1983), 94 Ill. 2d 378, 415-17, 447 N.E.2d 218, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct.

200; *People v. Miller* (1968), 40 Ill. 2d 154, 159, 238 N.E.2d 407, *cert. denied* (1968), 393 U.S. 961, 21 L. Ed. 2d 375, 89 S. Ct. 401; see also *People v. McQueen* (1983), 115 Ill. App. 3d 833, 840, 450 N.E.2d 921.) Defendant emphasizes that the evidence only demonstrated a large segment of the male population could have been the semen donor. It had no tendency to make the existence of any material fact as to the identification of the semen donor more or less probable.

In support of its position that the evidence was admissible, the State cites *People v. Johnson* (1976), 37 Ill. App. 3d 328, 345 N.E.2d 531. The court there stated that evidence of hair, blood, and semen found at a crime scene may be admitted, with appropriate foundation, even though its probative value was not considerable. (37 Ill. App. 3d 328, 332.) The State also argues that the determination of whether evidence is relevant is a matter within the sound discretion of the trial court and should not be disturbed upon review absent an abuse of discretion. (*People v. Jones* (1982), 108 Ill. App. 3d 880, 884, 439 N.E.2d 1011.) The State further maintains that even if the evidence was improperly admitted, the error was harmless beyond a reasonable doubt because of overwhelming evidence of defendant's guilt. Defendant counters that the State's heavy reliance on the *Johnson* case is misplaced in the instant situation because there the evidence derived its relevance from the differences in the blood types of the defendant and victim, the presence of the victim's blood type on defendant's clothing, and the presence of defendant's blood type at the scene of the rape. In the case before us, defendant and the victim had the same blood type, and defendant argues that the blood and semen test results cannot serve to identify defendant as the donor of the semen found in the rectal area.

We agree with defendant that the *Johnson* case fails to provide supporting authority on this issue. In *People v. Johnson* (1976), 37 Ill. App. 3d 328, 345 N.E.2d 531, the victim was attacked, beaten, and raped by a man who intruded with a shotgun upon her and her boyfriend as they were parked in a car. Neither the victim nor her boyfriend was able to see the attacker clearly. Nevertheless, the victim identified the voice of the defendant as the man who attacked her; hair similar to that of defendant's was found in the back seat of the car where the rape took place; and hairs said to be similar to the victim's were found on defendant's clothing. Regarding the blood evidence, it was determined that the victim had type O blood, the defendant type A, and her boyfriend a different type. Type O bloodstains were found on defendant's undershorts and inside of his trou-

sers. Seminal stains from a type A secretor were found on the car seat and floor. There was additional corroborating evidence regarding the shotgun, footprints, and teeth marks on the victim's body which tied the accused to the crime. The *Johnson* court determined that all of this evidence was properly admitted insofar as it tended to exclude others, such as the victim's boyfriend, and failed to exclude defendant as the attacker. We believe that the blood and semen evidence in the case before us was not relevant in that it only tended to put defendant in an extremely large category as possible donors. It did not provide the type of supporting information that *Johnson* did as a basis for admissibility.

We further believe that the cases upon which the *Johnson* court relied in permitting the evidence to be admitted are distinguishable. In *People v. Mann* (1975), 30 Ill. App. 3d 508, 333 N.E.2d 467, the court found that although circumstantial evidence regarding hair, blood, semen, and a knife might have been of relatively little probative value standing alone, it was sufficient as a whole to sustain the jury's finding of guilt. Prosecution witnesses testified that semen and hair samples found in the victim's home could have come from defendant and not from the victim's husband. Additional evidence revealed that a pair of eyeglasses found near the victim were of military prescription and of the same prescription as those worn by defendant, who was in the military. An optometrist testified that the odds were approximately one to four trillion that anyone else would have an identical prescription; therefore, in this type of situation the probative value of evidence such as blood or semen samples is increased as it relates to other factors.

In *People v. Gillespie* (1974), 24 Ill. App. 3d 567, 321 N.E.2d 398, the court held that the trial court did not err in admitting the results of blood tests conducted or in allowing the State's expert witness to testify about statistics of blood types in the general population. The defendant argued that results of blood tests only indicated the blood found at the scene of the crime could be his and not that it was his. Additionally, defendant submits that the blood left at the scene could have belonged to any one of a large group of other persons. The court noted that even conceding there could be a large group of persons with type A blood and a positive rheumatoid arthritis factor, the group was narrowed considerably when confined to a group in the neighborhood of the crime who had fresh bleeding cuts on their arms as defendant did. Again, other factors were present which narrowed the possible group of offenders and provided a basis for admissibility of the testimony.

Finally, the *Johnson* court relied on *People v. Smith* (1974), 19 Ill. App. 3d 138, 310 N.E.2d 818, in which evidence regarding defendant's blood type was admitted into evidence. In closing arguments the State indicated that the blood type B discovered on the undershorts of one defendant was consistent with the victim's blood type. Both defendants in the rape case had blood type O. The court found that the fact the blood may have come from another source did not preclude the State's arguing that it came from the victim. Additional evidence relating defendants to the crime included hair samples, identification of a car license number, and fingerprints.

The instant case is in sharp contrast to the above cases in which courts permitted blood and semen evidence to be admitted in proving guilt beyond a reasonable doubt. We believe the facts and circumstances of the case fall far short of providing a basis upon which such evidence could have been admitted. In order to be admissible, evidence must have some relevance and fairly tend to prove the offense charged. Evidence will be considered relevant where the circumstance or fact offered tends to prove or disprove a disputed fact or render the matter in issue more or less probable. (*People v. Jones* (1982), 108 Ill. App. 3d 880, 884, 439 N.E.2d 1011.) Relevancy is to be determined in light of the logic, experience, and accepted assumptions concerning human behavior. (*People v. Currie* (1980), 84 Ill. App. 3d 1056, 1061, 405 N.E.2d 1142.) Our review of the record reveals that neither of the experts who testified for the State could identify characteristics in the blood or semen samples which would tend to make the likelihood that defendant committed the crime more or less probable. Podlecki's testimony that the samples either came from a nonsecretor, which included 20% of the population, or that the antigens were too deteriorated to make a determination established nothing more than that, at best, the semen found came from someone within a 20% group of the general population. Tahir's testimony similarly demonstrated nothing more than that defendant could not be excluded as the semen donor. We believe that this testimony served no relevant purpose, was totally lacking in probative value, and thereby prejudiced defendant's cause. Because defendant was denied a fair trial when the trial court admitted the testimony into evidence, we reverse defendant's conviction and remand for a new trial on this basis. We therefore need not address the contention that the admission of the State's evidence impermissibly shifted the burden onto defendant to refute an inference created by the testimony.

Because we remand the case for a new trial, we believe it appropriate to consider other issues raised by defendant relating to

matters which potentially might arise on retrial. Defendant also contends that the trial court erred in denying his pretrial motion to dismiss the indictment. He claims that the conduct of the prosecutor violated his right to due process of law in procuring the indictment. An assistant State's Attorney who was one of the trial prosecutors testified before the grand jury regarding facts of the blood and enzyme testing performed by the forensic scientists from the Illinois Department of Law Enforcement. He stated:

"In this particular case, the forensic chemist stated that the seminal fluid is from a person who is a non-secretor. Duane Allan Schulz is a non-secretor. He has a PGM of one. The seminal fluid which was found in the body has a PGM of one."

Defendant argues that the reports supplied by the Illinois Department of Law Enforcement did not contain the conclusions testified to by the assistant State's Attorney. He urges that because the conclusions were not based upon the evidence in the case, they were improper and prejudicial and therefore cause for a new trial. See *People v. Whitlow* (1982), 89 Ill. 2d 322, 341, 433 N.E.2d 629, *cert. denied* (1982), 459 U.S. 830, 74 L. Ed. 2d 68, 103 S. Ct. 68.

The State, in contrast, argues that the assistant State's Attorney properly testified to the conclusions of Podlecki and Tahir. Further, the State maintains that the grand jury's determination of probable cause and returning of an indictment is final and cannot be the subject of a direct attack in a subsequent proceeding unless all the witnesses or all the testimony upon which the indictment was founded are incompetent. (*People v. Moore* (1975), 28 Ill. App. 3d 1085, 1089, 329 N.E.2d 893; *People v. Bissonnette* (1974), 20 Ill. App. 3d 970, 974, 313 N.E.2d 646.) The State emphasizes that Lieutenant DuBois of the Bedford Park police department and Cook County sheriff's police investigator Mark Baldwin were competent to testify before the grand jury, and defendant did not allege otherwise. Defendant retorts that he never contended that the assistant State's Attorney's testimony before the grand jury was incompetent but, instead, that a prosecutor who testifies falsely as to facts relevant to the issue denies defendant due process of law. Even though wide latitude is given to the State in initiating prosecutorial proceedings, defendant submits that this latitude should not extend to permit the State to avoid preliminary hearings, proceed by direct indictment, and then have an assistant State's Attorney sworn in and falsely summarize the evidence.

Defendant is correct in his assertion that the assistant State's Attorney improperly stated the contents of the reports before him. Neither of the reports indicated that the semen came from a nonsecretor;

rather, Mr. Tahir stated in his report that the semen *could have* come from a nonsecretor. Nevertheless, we cannot agree that the court erred in denying defendant's motion to dismiss the indictment. The validity of an indictment is not affected by the character of the evidence considered as long as there is some evidence in support of the charges and the indictment is valid on its face. (*In re D.T.* (1986), 141 Ill. App. 3d 1036, 1041, 490 N.E.2d 1361.) Further, a court will not dismiss an indictment based upon allegations of prosecutorial misconduct unless that conduct results in actual and substantial prejudice to the defendant. (*People v. Barton* (1984), 122 Ill. App. 3d 1079, 1083, 462 N.E.2d 538, *cert. denied* (1985), 469 U.S. 1213, 84 L. Ed. 2d 332, 105 S. Ct. 1185.) Defendant did not allege that all of the witnesses or all of the testimony at the grand jury proceedings was incompetent or inadequate or that the charging paper was invalid on its face. (*In re D.T.* (1986), 141 Ill. App. 3d 1036, 490 N.E.2d 1361.) Moreover, he has not convinced us that the prosecutor's error resulted in substantial prejudice to him in light of the testimony of others at the proceedings. We will, therefore, not inquire into the grand jury proceedings to determine if the evidence heard was sufficient to support the indictment. *People v. Moore* (1975), 28 Ill. App. 3d 1085, 329 N.E.2d 893; *People v. Bissonnette* (1974), 20 Ill. App. 3d 970, 313 N.E.2d 646.

■ Defendant next argues that the trial court erred in allowing into evidence irrelevant and prejudicial testimony which denied him a fair trial under State and Federal due process standards. He first maintains that Jeri Lynn Myers' explanation of her reasons for changing her testimony at trial was irrelevant, prejudicial, and constituted evidence of other crimes. In her grand jury testimony, Ms. Myers stated that she saw the victim leave the Schulz home at approximately 8:30 p.m. on the evening of February 15, 1981. She later modified this testimony to explain that she did not actually see the victim leave the home but saw her come into the room, wave, and say good-bye. At trial, however, Myers changed her testimony and stated that she neither saw her leave the home nor say good-bye. Myers also informed the grand jury she did not see defendant and the victim or hear any statements but only heard laughing and wrestling in the bedroom; nevertheless, at trial she testified that she saw defendant on top of the victim and heard her indicate that she would break off their relationship if defendant did not stop using drugs. Myers admitted that she previously testified falsely at the grand jury proceedings. She indicated that her reason for doing so was that on the night before she was to testify before the grand jury, defendant's brother took her for a ride, told her that they "had to get their stories straight," and

backslapped her while they were in the car.

Defendant argues that Myers' testimony was objectionable because it aroused the prejudice of the jury and distracted it from the issues involved. He argues that because at least three persons testified that the victim left defendant's house, Myers' testimony impermissibly influenced the jury and discounted the credibility of defendant and his brother on this issue. Defendant claims that admission of Myers' testimony of what occurred between her and Ray Lees a year and a half after the victim's death jeopardized his right to be tried solely for the murder (*People v. Reimnitz* (1979), 72 Ill. App. 3d 761, 391 N.E.2d 380), because certain inflammatory testimony might overpersuade the jury and cause them to convict defendant as an "evil person" rather than for the crime charged. 72 Ill. App. 3d 761, 763, 391 N.E.2d 380.

The State counters that Myers' testimony was clearly relevant to explain her reason for testifying as she did before the grand jury and that no questions were raised regarding Myers' relationship with defendant's brother until after being raised by defense counsel on cross-examination. According to the State, defendant's claim that the testimony elicited evidence of other crimes is without merit because the only evidence of a "crime" in Myers' testimony was that defendant's brother slapped her and told her they had better get their stories straight. This evidence, the State argues, was relevant to explain Myers' conduct before the grand jury and did not have a prejudicial effect on defendant. Additionally, the cases cited by defendant in support of his argument, including *Reimnitz*, are distinguishable because they refer to crimes committed by the same defendant which have a direct relation to the crime for which he is being tried. The State emphasizes that the conduct referred to in the instant case was that of defendant's brother and not of defendant. Therefore, it had no relationship to defendant's conduct or to his guilt or innocence and could not thereby inflame the jury on this basis.

We agree with the State's position. An examination of the record reveals that defense counsel reviewed the statements of Myers made before the grand jury which demonstrated the inconsistencies with her in-court testimony. Myers admitted that she testified falsely before the grand jury. Where a witness has admitted making a prior inconsistent statement, the party calling him or her on redirect examination can ask for an explanation of the discrepancy and the circumstances under which it was made. (*People v. Hanson* (1980), 83 Ill. App. 3d 1108, 1114, 404 N.E.2d 801; *People v. McMullen* (1980), 82 Ill. App. 3d 1042, 1049, 403 N.E.2d 539.) We therefore believe that

the testimony was properly admitted and did not raise such prejudice so as to deny defendant a fair trial.

■■ ■ Defendant also charges that the testimony of Pamela Stanton was improperly admitted. Ms. Stanton testified regarding a conversation she had with Jeri Lynn Myers in July of 1981. She was permitted to testify that Myers told her she heard fighting coming from defendant's bedroom while in defendant's house on February 15, 1981, heard the victim crying for defendant to leave her alone, and heard her telling defendant that she would terminate their relationship if he did not stop using drugs. Defendant argues that although this information was admitted to rebut the inference that Myers' in-court testimony was of "recent fabrication," it was so prejudicial that it requires the reversal of his conviction.

A witness who has been impeached by a prior out-of-court statement which is inconsistent with his testimony in court generally cannot introduce evidence of other prior statements consistent with the in-court testimony. (*People v. Clark* (1972), 52 Ill. 2d 374, 389, 288 N.E.2d 363; *People v. Manley* (1982), 104 Ill. App. 3d 478, 483, 432 N.E.2d 1103.) However, where an inference has been made that the testimony is of recent fabrication, such evidence of prior out-of-court statements is admissible to demonstrate that the witness provided the same information prior to the time a motive to fabricate the story came into existence. *People v. Clark* (1972), 52 Ill. 2d 374, 288 N.E.2d 363; *People v. Faysom* (1985), 131 Ill. App. 3d 517, 524-25, 475 N.E.2d 945; *People v. Klinkhammer* (1982), 105 Ill. App. 3d 747, 748-49, 434 N.E.2d 835.

At trial, defense counsel elicited the following information from Ms. Myers:

"COUNSEL: What is the first time that you told any law enforcement officer that Ray Lees tried to get you to say things?

MYERS: The first time?

COUNSEL: Yes. This morning?

MYERS: Yes.

COUNSEL: Was that Mr. Brady (assistant State's Attorney)?

MYERS: Yes.

COUNSEL: Did he bring it up or did you bring it up?

MYERS: I brought it up.

COUNSEL: And this is three years since the incident, is that correct?

MYERS: Yes."

The State argues that this colloquy demonstrates defense counsel cre-

ated a clear inference that Myers' in-court testimony was of recent fabrication and that she had not shared the information with anyone prior to the trial.

Defendant, in contrast, maintains that the recent-fabrication rule has no application where the witness has either admitted the making of the contradictory statement or made the statement in prior testimony. He relies on *People v. Depoy* (1968), 40 Ill. 2d 433, 438-39, 240 N.E.2d 616, for the proposition that where a witness has been impeached with out-of-court statements which contradicted his in-court testimony, evidence of other previous statements agreeing with his testimony are not competent. *Depoy*, however, can be distinguished from the instant case. That case comports with the general rule against the admission of prior consistent statements; it did not involve a factual scenario in which there was concern about a witness' motive to testify falsely or about an inference of recent fabrication. Therefore, the question before this court is simply whether defense counsel's questioning created an inference of recent fabrication and a determination of the issue can be made on that basis. We believe that Stanton's testimony regarding Myers' motive for changing her statements was properly admitted to rebut any inference of recent fabrication by Myers.

■ Defendant also argues that other testimony of Stanton was prejudicial. The State elicited from Stanton information of a conversation with Myers in which defendant allegedly told her that he was glad that the victim was gone because he was in love with Myers and wanted to take her out. Defendant's objection that the testimony was hearsay and inadmissible was overruled on the basis that defense counsel had "opened the door" in his cross-examination of Myers. Defendant argues, however, that Myers never testified to any such matter, that there is no relevancy to the statement, that the statement reveals no motive for the murder, and that the statement is neither an admission nor an incriminatory statement. The State contends that defense counsel "opened the door" by questioning Myers about her recent fabrication of events surrounding the incident and that inquiry into defendant's actions and his conversation with Myers was within the scope of the issues raised in the cross-examination. We disagree. Even though defense counsel "opened the door" when he questioned Myers about changing her story, this did not then permit the State to elicit any and all information about the conversation between Stanton and Myers. In order for testimony to be admissible, it must have relevance to the matter in question. (*People v. Jones* (1982), 108 Ill. App. 3d 880, 884, 439 N.E.2d 1011.) We agree with defendant that

his alleged statements were neither relevant nor incriminatory and did not provide information regarding a motive for the crime. Thus, the trial court erred in overruling defendant's objection.

Defendant next contends that the testimony of a rebuttal witness further compounded the prejudice against him. Randy Havel testified that he had a conversation with defendant in the home of a friend one month after the victim's death. Over defense counsel's objection, Havel testified that defendant told him, "She got exactly what she deserved for f___g around with Roger. He was supposed to be my friend." Defendant also argues that Havel was permitted to testify that defendant told him he slapped the victim around the bedroom on a number of occasions. The State maintains that the testimony was relevant to defendant's conduct before and after the murder which served to show his involvement and "clearly implicates" him in the crime. A review of the record reveals that Havel was not permitted to testify before the jury regarding defendant's statements about slapping the victim. However, we believe the trial court erred in admitting Havel's testimony about the victim's relationship with Roger. This testimony did not in any way implicate defendant as the offender nor did it provide information regarding defendant's alleged involvement.

Defendant also maintains that the State's evidence failed to prove him guilty beyond a reasonable doubt, thereby violating his constitutional right to due process of law. First, he claims that the jury based its finding of guilt upon the testimony of Jeri Lynn Myers, whom he characterizes as an "admitted perjurer." As previously mentioned, Myers' testimony at trial varied from her testimony during grand jury proceedings. Myers explained that defendant's brother forcefully induced her to testify falsely in order to protect defendant. Defendant additionally claims that the jury based its finding of guilt upon the incriminatory statements of Guy Thompson. This witness admitted to long-standing problems with alcohol and stated he "didn't quite really understand everything" when he had conversations with defendant. Thompson testified that after a concert in November 1981, defendant told him he had killed "her" but the police had nothing on him. He indicated that defendant again repeated this remark a few weeks later. However, defendant emphasizes that Thompson did not come forward with this information until November 1982, when the police asked him to come to the police station.

In this regard, defendant argues that Myers' trial testimony is in conflict with that of others. He claims that her original testimony provides confirmation that he returned home as Myers and Lees were

leaving around 9:45 p.m. and related the story to them of the altercation at the bar. Additionally, defendant submits that it is extremely unlikely that he was in the victim's car which her brother saw at a gas station around 9:30 p.m., drove the car to the victim's home in Bedford Park, and returned to his home in Bridgeview by 9:45 p.m. He claims it is equally unlikely he left his house with the victim at approximately 8:50 p.m., killed her, took her body to the cemetery area to dispose of it, and was then seen in the victim's car by her brother at around 9:30 p.m. Defendant adds that he further was denied due process because the State's blood evidence was consistent with the guilt of anyone in the general male population and because the determination of his guilt was inconsistent with the testimony of Brian Wraxall, the forensic serologist who testified in his behalf.

According to defendant, where a conviction is based entirely upon circumstantial evidence, the facts proved must be consistent with the guilt of the defendant and inconsistent with any reasonable hypothesis of innocence. (*People v. Giangrande* (1981), 101 Ill. App. 3d 397, 400, 428 N.E.2d 503, citing *People v. Branion* (1970), 47 Ill. 2d 70, 77, 265 N.E.2d 1, *cert. denied* (1971), 403 U.S. 907, 29 L. Ed. 2d 683, 91 S. Ct. 2213.) Circumstantial proof for a valid conviction "must be of a conclusive nature and tendency leading, on the whole, to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime." (*People v. Williams* (1977), 66 Ill. 2d 478, 484-85, 363 N.E.2d 801.) A conviction cannot be supported by assumption, speculation, or conjecture. *People v. Boswell* (1974), 19 Ill. App. 3d 619, 621, 312 N.E.2d 17.

The State counters that defendant was proved guilty beyond a reasonable doubt where there was evidence that, on the night of the murder, he was heard and seen arguing and fighting with the victim, the victim was last seen with defendant near the time of her death, the semen sample did not exclude defendant as the offender, and defendant admitted to the killing on several occasions. The State maintains that it is a well-established principle of law that questions of credibility and the weight to be accorded evidence are for the trier of fact, and a reviewing court will not reverse a trial court's determination unless the evidence is so improbable as to raise a reasonable doubt of defendant's guilt. (*People v. Ellis* (1978), 74 Ill. 2d 489, 496, 384 N.E.2d 331; *People v. Schultz* (1981), 99 Ill. App. 3d 762, 770, 425 N.E.2d 1267.) The State points out that, although defendant claims that the jury based its finding of guilt exclusively upon the testimony of Myers and Thompson, the State presented 16 witnesses in its case in chief. Moreover, the State submits that not even the defense expert

could positively exclude defendant as the semen donor.

In order not to subject defendant to any possibility of double jeopardy, we must address his contention that he was not proved guilty beyond a reasonable doubt, even though we have reversed the conviction and remanded the cause for a new trial. If the evidence produced by the State is not sufficient to prove defendant guilty beyond a reasonable doubt, it would be improper to afford the State another opportunity to provide evidence during a second proceeding which it did not produce during the first one. (*People v. Taylor* (1979), 76 Ill. 2d 289, 309, 391 N.E.2d 366.) We believe that the evidence before the jury in this case was sufficient to support defendant's murder conviction. In removing the risk of double jeopardy, however, we have considered only the sufficiency of the evidence admitted at the original trial; we make no finding as to defendant's guilt or innocence on retrial. *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366; *People v. Frazier* (1984), 127 Ill. App. 3d 151, 153-54, 469 N.E.2d 594.

Because of our decision to reverse and remand, we need not address defendant's final contention that the prosecutors, in closing arguments, misstated the facts regarding the blood testing and invited the jury to speculate and accept unproved probability factors. Additionally, we need not pass upon defendant's argument that the trial court's denial of a hearing on his post-trial petition was cause for reversal. Any possibility that his constitutional rights were violated by the State's failure to disclose pending criminal charges against Jeri Lynn Myers should not arise upon retrial.

For the foregoing reasons, this cause is reversed and remanded for a new trial in accordance with this opinion.

Reversed and remanded.

RIZZI and WHITE, JJ., concur.