THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PAUL WRIGHT, Defendant-Appellant.

First District (1st Division)   Nos. 1—86—1499, 1—86—1741 cons.

Opinion filed June 5, 1989.—Rehearing denied August 3, 1989.—Modified opinion filed August 14, 1989.

160

Randolph N. Stone, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Judy L. Groeneveld, and Pamela Hughes, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Defendant Paul Wright was charged with home invasion (Ill. Rev. Stat. 1987, ch. 38, par. 12—11) and aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—16). Wright had a jury trial that ended in a mistrial when the jury could not reach a verdict. After a second trial, the jury found Wright guilty. Wright was convicted and

sentenced to 50 years' imprisonment. Wright appeals the verdict, arguing that the trial court admitted irrelevant and prejudicial evidence and that he was prejudiced by inflammatory remarks by the prosecution during closing arguments. For the reasons below, we affirm.

The victim lived with her two sons at 3724 S. Cottage Grove Avenue in Chicago. On July 21, 1985, the victim and her sons spent the day at a picnic and returned home between 9 and 9:30 p.m. The older son went to bed, and the victim and younger son, age four, fell asleep watching TV in the living room. The lights from the kitchen and living room were left on.

Some time later, the victim was awakened by an intruder who held a knife at her neck. The intruder told the victim to lie on the floor. After she did so, the intruder dropped his pants and forced his penis into her vagina. At that time, the son was awake and watching. The victim asked the intruder to let the boy go upstairs, but the intruder refused.

After about 10 or 12 minutes, the intruder told the victim to lie on her stomach. He then attempted to put his penis into her rectum, but could not. He put his fingers into her rectum. After a few minutes, the intruder told the victim to get up. These actions were witnessed by the boy, who was now crying. The victim told her son to go upstairs to his bedroom, and the intruder hit her in the eye. He then told her to bend over, and he again put his fingers into her rectum.

The victim asked the intruder to let her go to the bathroom and promised not to scream. He refused. The victim struggled and broke away from the intruder. She ran upstairs to the bathroom, closed the door, and screamed out the window for help. After about five minutes, she opened the door and walked down the hallway, but was afraid to go downstairs. She returned to the bathroom, where she saw the intruder running away.

The victim called her mother and the police. While waiting for them to arrive, she noticed that a small window in the living room, facing Cottage Grove, was open. She closed it. She also discovered $10 missing from her bedroom. The victim's mother and the police arrived at about 2 a.m.

The victim told police officer Ballard that she had been raped. She described the offender as a black male with a dark complexion, large eyes, close-cut hair, light mustache, early to mid-twenties, about 5 feet 3 inches tall, about 130 to 135 pounds, wearing a light or white short-sleeved shirt, blue jeans, and sandals. After giving the description, the victim was taken to a hospital and examined. Her right eye and cheek were swollen, and she had a cut about an inch long on her

neck. Samples were taken from her vagina with a Vitullo Kit. No rectal samples were taken because the victim complained of soreness.

On August 1, 1985, the victim went to the police station at 11th and State, where she worked with composite artist Leo Feldman to prepare a sketch of the offender. When the sketch was done to the victim's satisfaction, Officer Walter Donald copied the sketch and distributed it to other officers. On August 2, the victim examined three photo albums of black male sex offenders in their twenties and recognized no one. The defendant's photo was not in any of the albums.

Officer Donald had recognized Paul Wright from the composite sketch, although he did not know Wright's name. On August 18, Donald showed the victim a photo of Wright with photos of four other men who lived in the victim's neighborhood. The victim identified Paul Wright as the man who had raped her.

On August 19, Donald and three other officers arrested the defendant at his home at 3750 S. Ellis Avenue, about a block and a half from the victim's residence. The next day, the victim picked the defendant out of a lineup, asserting that she had no doubts about her identification. Wright was charged with home invasion and aggravated criminal sexual assault and had a jury trial. The trial ended in a mistrial when the jury was unable to reach a verdict.

At Wright's second trial, the victim and the police officers involved testified to the above facts. In addition, Officer Donald testified that the victim's apartment was visible from the defendant's apartment. Donald identified two photographs of the front of the victim's apartment, taken from the fifth-floor front of the defendant's apartment building. Donald also testified, over objection, that it was possible to reach the victim's living room window by scaling the porch roof and that he had done so. The trial court allowed the testimony with the instruction that the testimony was allowed only for the limited purpose of showing that it was possible to enter the second-floor apartment from the front of the building.

An investigator for defense counsel, Colin Smith, testified that on January 7, 1986, he briefly interviewed the victim at her apartment. Smith testified that the victim had indicated doubt about selecting Wright out of the lineup, but the victim later testified that she had told Smith she had had no doubts about the lineup.

Ms. Pamela Fish, a serologist for the Chicago police department, testified that on January 10, 1986, she had examined the vaginal samples taken from the victim and saliva samples taken from the victim and Wright. Ms. Fish testified that the vaginal sample contained spermatozoa and that tests to determine the presence of any ABO blood

group showed that the victim's assailant exhibited the same characteristics as 40% to 60% of the black male population.

Paul Wright testified on his own behalf that he was at home with his girlfriend when the crime was committed. Wright also testified that until July 29 or 30, 1985, he had worn his hair in a seven- or eight-inch permanent. Wright's barber testified that he cut Wright's hair sometime in the last week of July or first week of August and had cut it short except for a tuft of hair at the back of the neck.

Wright also testified that he had a scar on his forehead and had carried the scar since he was three years old. Wright identified pictures of himself taken before July 1985. The victim had not mentioned the scar in any of the descriptions she had given police.

On cross-examination, Wright was asked over objection about an interview with a paramedic after he was taken into custody, during which he had been asked whether he had any scars. Wright testified that he had told the paramedic about the scar on his forehead, but the paramedic's report, which Wright signed, noted a scar on Wright's arm, but noted no scar on his forehead. The prosecution asked Wright 17 questions concerning the conversation and report.

In a sidebar conference following cross-examination, the prosecution admitted that it had not tendered the paramedic's report to defense counsel during discovery. The court granted defense counsel's motion to strike the testimony concerning the paramedic's interview and report and instructed the jury to disregard the testimony.

During closing arguments, the prosecution stated, "If you buy the defense, then it's open season on women in Chicago. You can rape them and no one will ever be convicted of rape in this county if you buy that type of defense." During rebuttal, the prosecution stated, "They're asking you to let that rapist get out of that chair, out that door back on the streets of Chicago, because of what the police department didn't do." Defense counsel's objections to each of these comments were sustained. With respect to Investigator Smith, the prosecutor stated that he was "paid to perform a task," and he "came back to them with the information that they wanted to hear." Defense counsel's objection was sustained. In addition, the prosecutor addressed the burden of proof, endorsed the victim's testimony as credible, and asserted that Ms. Fish's testimony concerning the blood groups corroborated the victim's testimony. Finally, the prosecution argued that the victim identified "the person that lives five flights up with a perfect position to look down at her ***. Just like a vulture sits." The jury found Wright guilty, and he was sentenced to 50 years' imprisonment. Wright appeals the verdict.

■ Wright first argues that the State attempted to impeach him with his interview with a paramedic and the paramedic's report, evidence Wright contends was inadmissible because the State failed to tender the evidence to defense counsel during discovery, in violation of Supreme Court Rule 412(a)(ii) (107 Ill. 2d R. 412(a)(ii)), which states:

> "Except as otherwise provided in these rules as to matters not subject to disclosure and protective orders, the State shall, upon written motion of defense counsel, disclose to defense counsel the following material and information within its possession or control:
>
> *** (ii) *any* written or recorded statements and the substance of *any* oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgment of such statements." (Emphasis added.) (107 Ill. 2d R. 412(a)(ii).)

The language of the rule plainly includes all statements, regardless of when or where they were made, and provides no exception for even innocent or inadvertent suppression of statements by the State. (*People v. Caliendo* (1980), 84 Ill. App. 3d 987, 405 N.E.2d 1133, *appeal denied* (1980), 81 Ill. 2d 594.) The trial court therefore properly ruled that the evidence was inadmissible, ordered it stricken, and instructed the jury to disregard it.

■ Wright also contends that allowing the jury to hear the evidence was an error too prejudicial to be cured, but the cases Wright cites to support his contention addressed statements that either implicated the defendant's constitutional rights, or were highly inflammatory. (See *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (confrontation clause); *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 405 N.E.2d 1306, *appeal denied* (1979), 79 Ill. 2d 616 (right to counsel); *People v. McCray* (1978), 60 Ill. App. 3d 487, 377 N.E.2d 46 (reference to defendant as a professional criminal).) Here, however, the interview and report implicated no constitutional rights, nor were they inflammatory. Further, the effect of the evidence would have been offset by the jury's ability to see Wright and determine whether the scar was as noticeable as Wright maintained, without regard to Wright's conversation with the paramedic or the paramedic's report. Moreover, the failure to note the scar confused neither the victim nor police investigators in their identification of Wright. The victim gave a detailed description of her assailant, to which Wright closely corresponded in all respects apart from the scar. The victim also worked with the composite artist to produce a sketch

that Officer Donald was able to recognize as Wright, although the sketch did not show a scar and Donald did not know who Wright was. Any error arising from the evidence was therefore harmless.

■ Wright next argues that he was denied a fair trial because the State used the serologist's testimony and photos of the view from Wright's apartment window, both of which Wright claims were irrelevant and prejudicial. Admission of evidence is within the discretion of the trial court, and its rulings will not be overturned absent an abuse of discretion. (*People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696.) The record shows that the trial court rulings were proper.

The blood group tests testified to by the serologist showed that the victim's assailant was part of a group that comprised 40% to 60% of the black male population, and that Wright, as part of that group, could not be ruled out. Wright contends that such an assertion was too broad to be probative, citing *People v. Linscott* (1987), 159 Ill. App. 3d 71, 511 N.E.2d 1303, *appeal allowed* (1987), 117 Ill. 2d 549, and *People v. Schulz* (1987), 154 Ill. App. 3d 358, 506 N.E.2d 1343, *appeal denied* (1987), 116 Ill. 2d 572. In *Linscott* and *Schulz*, however, blood group tests were used in murder trials to identify the defendant as the murderer. The instant case is more closely analogous to those discussed in *Schulz*, where blood group tests were used to single out the defendants by showing that the tests conclusively ruled out the others, but did not rule out the defendants. (*Schulz*, 154 Ill. App. 3d at 364-65. See also *People v. Johnson* (1976), 37 Ill. App. 3d 328, 345 N.E.2d 531, *appeal denied* (1976), 63 Ill. 2d 560; *People v. Mann* (1975), 30 Ill. App. 3d 508, 333 N.E.2d 467, *appeal denied* (1975), 61 Ill. 2d 599; *People v. Gillespie* (1974), 24 Ill. App. 3d 567, 321 N.E.2d 398.) Here, the victim's identification of Wright as her assailant served to define the group of possible assailants (one), and the tests supported the identification by showing that he could not be ruled out. Thus the blood group tests were admissible.

■ Wright also contends that the photos from his apartment window, taken by Officer Donald shortly before trial, were irrelevant because they relied on the unsupported assumption that Wright had spied on the victim and planned his attack. But the State argues that, rather than relying on an unsupported assumption, the evidence may reasonably be viewed as supporting the inference that Wright had planned his attack of the victim. The trial court did not abuse its discretion in allowing either the photos or the blood group tests.

■■ Finally, Wright argues that he was prejudiced by improper and prejudicial remarks made by the prosecution during closing arguments. Where improper remarks are made and defense counsel ob-

jects, the prejudice is cured when the trial court sustains the objections (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200; *People v. Sanchez* (1987), 163 Ill. App. 3d 186, 516 N.E.2d 556) and instructs the jury to disregard the improper remarks (*People v. Smith* (1982), 111 Ill. App. 3d 895, 444 N.E.2d 801, *appeal denied* (1983), 93 Ill. 2d 547). Errors, however, not objected to at trial or raised in the post-trial motion are waived. (*People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739; *People v. Sadaka* (1988), 174 Ill. App. 3d 260, 528 N.E.2d 283.) Assuming that the remarks were improper, the record shows that the trial court sustained objections to several remarks and instructed the jury to disregard the remarks. Where defense counsel did not object, the record shows that the issue was not preserved for appeal and therefore waived. The record further shows that Wright was not substantially prejudiced by the remarks.

The prosecution asserted, "[i]f you buy the defense, then it's open season on women in Chicago," that "[y]ou can rape them and no one will ever be convicted of rape in this county if you buy that type of defense," and that "[t]hey're asking you to let that rapist get out of that chair, out that door back on the streets of Chicago because of what the police department didn't do." The trial court sustained objections to each of these comments and instructed the jury to disregard them. The prosecution also addressed the work of defense investigator Smith, stating that he was "paid to perform a task," and "he came back to them with the information that they wanted to hear." The above remarks were made just once, defense counsel's prompt objections were sustained, and the jury was instructed to disregard the remarks. Further, the jury was instructed that closing arguments were not evidence. No reversible error arose from the remarks.

The prosecution also addressed the burden of proof and the credibility of the victim's testimony, which Wright argues amounted to a prosecutorial endorsement of the victim. Wright also argues that the prosecution overstated the value of the blood group tests and improperly argued inferences arising from the view from Wright's apartment window, characterizing Wright as a vulture looking down at its prey. The record shows, however, that defense counsel made no objections to the above remarks and did not address them in the motion for new trial. The issues were waived.

In summary, Wright argues that he was denied a fair trial because he was improperly cross-examined with inadmissible evidence, irrelevant testimony was admitted, and the prosecution made improper and prejudicial remarks in closing argument. The record shows, however, that although the evidence used in cross-examination was inadmissi-

ble, it was properly stricken, and any prejudice was cured by both an instruction to the jury and other evidence. The blood group tests and the photos of the view from Wright's window served to corroborate the victim's identification by placing Wright in proximity to the crime and showing that he could not be ruled out after the victim identified him. Finally, objections to remarks by the prosecution were either properly sustained, or the right to challenge them was waived. The conviction and sentence of Paul Wright for aggravated criminal sexual assault is affirmed.

Affirmed.

MANNING, P.J., and CAMPBELL, J., concur.