THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDMOND JIMENEZ, Defendant-Appellant.

First District (2nd Division) No. 1—86—3471

Opinion filed November 14, 1989.—Rehearing denied December 12, 1989.

Randolph N. Stone, Public Defender, of Chicago (Richard E. Cunningham, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and David R. Butzen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Defendant-appellant Edmond Jimenez was charged by indictment with attempted aggravated kidnapping in connection with the attempted abduction of nine-year-old N.R., and with two counts of aggravated kidnapping and 12 counts of aggravated criminal sexual assault in connection with the abduction and sexual assault of seven-year-old B.C. on the same date. Following a jury trial, he was found guilty of aggravated criminal sexual assault, criminal sexual assault, aggravated kidnapping, and attempted aggravated kidnapping. He was sentenced to concurrent terms of 60 years' imprisonment for

aggravated criminal sexual assault, 15 years' imprisonment for criminal sexual assault, 15 years' imprisonment for aggravated kidnapping, and 7 years' imprisonment for attempted aggravated kidnapping.

Defendant raises as issues on this appeal (1) whether hair and blood comparison evidence was improperly admitted at trial; (2) whether the trial court erred in refusing to allow him to recall one of the complaining witnesses for the purpose of laying a foundation for impeachment with a prior inconsistent statement; (3) whether reversal of his conviction is required because of the admission at trial of a police officer's hearsay testimony; (4) whether the trial court erred in instructing the jury to return a general verdict on the counts of the indictment alleging aggravated criminal sexual assault; (5) whether the criminal sexual assault or aggravated criminal sexual assault statutes violate due process; (6) whether the trial court erred in not transferring and then denying his motion for a substitution of judges; (7) whether his exercise of his right to a jury trial, the ages of his victims, and improper convictions were erroneously considered by the trial court at sentencing; and (8) whether any of the foregoing issues which are deemed waived because of defense counsel's failure to preserve them, must nevertheless be considered on their merits because trial counsel's failure to preserve any issue that has merit constituted ineffective assistance of counsel.

N.R., 10 years old at the time of trial, testified that on January 14, 1986, she and her younger sister were walking to a grocery store when a red station wagon with a red steering wheel and "smoky windows" approached them on the corner of 61st Avenue and 15th Street in Cicero, Illinois. The man inside the car, whom N.R. later identified as defendant, leaned out of the window and, from a distance of two feet, said, "[Your] mother sent me to pick you up." N.R. shook her head and the man said, "No, not her," indicating N.R.'s sister. N.R. shook her head again and the man said, "Oh, okay, I'm sorry." The man then drove away and turned into an alley. N.R. ran home and told her mother about the incident.

N.R.'s mother testified that N.R. left for the store at 3:15 p.m. and returned approximately 10 minutes later. N.R. was crying and told her mother that "some man tried to get her in the car." N.R. told her mother that the man was 20 to 30 years old, with dark, neck-length hair and a mustache, and was driving a dirty red station wagon with old, dirty windows. N.R.'s mother called the police and gave them this information. N.R. gave the police the same description of the man later that evening, except that she stated he had the "start" of a mustache and was wearing a white shirt and a blue jacket.

B.C., eight years old at the time of trial, testified that on January 14, 1989, at about 3:30 p.m., a red station wagon with "dark windows" approached her as she and her sister were walking down Elm Street near 15th Street in Berwyn, Illinois. The man inside the car opened the door and, speaking to her sister, said, "Do you know this address?" B.C. walked to the edge of the car, at which point the man grabbed her and pulled her inside. The man ordered B.C. to lie under the dashboard on the passenger side; told her to cover her eyes; and said "[b]e quiet or I will *** poke your eyes out or smash your head in." With B.C. under the dashboard, the man drove for 15 minutes before stopping. When he stopped the car he "helped" B.C. take off her boots; ordered her into the back seat of the car; and told her again to keep her eyes closed. The man exited the car and reentered through the back passenger side door. He then ordered B.C. to take off her pants and underwear.

B.C. testified that she heard the man "unsnapping" his pants before "something" was put into her vagina. She could not see what touched her, but "thought she knew what it was." B.C. was then ordered to put her clothes back on and climb back underneath the dashboard in the front of the car. The man drove the car again, let B.C. out in an alley, and then drove off. B.C. left her underwear and boots in the car.

Eventually, B.C. approached Sandra Fernatt on the street and asked to use her phone. Fernatt testified that she saw B.C. at about 4:15 p.m. on the corner of 19th and Home Streets in Berwyn, took B.C. to her own house, and called the police. The police arrived at about 5 p.m. and took B.C. to the hospital.

The physician who examined B.C. at the hospital testified that he found abrasions on her neck; a bruising of her abdomen; and some superficial lacerations around the exterior of her vagina that were three to four inches long with visible amounts of blood.

Officer Kenneth Kravcik of the Berwyn police department testified that at 3:45 p.m. on January 14, 1989, he received a call of an attempted child abduction. The suspect was described as a white male with long, brown hair driving an older model red station wagon with tinted windows. One red station wagon was stopped by other Berwyn police officers, but the driver did not match the suspect's description and was released. At about 4:10 p.m., Kravcik, who was in a marked squad car and in police uniform, stopped a red station wagon driven by defendant. Defendant was wearing a "bluish" jacket, a white shirt that was opened, and dark pants with an opened zipper. Kravcik ordered defendant to exit the car. Defendant asked "Why?" and Krav-

cik opened the car door and again ordered defendant out. Defendant then put his car in reverse and sped away. At 4:23 p.m., after a high-speed chase, defendant was finally apprehended.

Officer David Hartman of the Cicero police department testified that at about 3:50 p.m. on January 14, 1989, he also received a report of an attempted child abduction and a description of the suspect. Hartman received a second call from the Berwyn police directing him to a location where a red station wagon had been spotted. Upon arriving at the location, Hartman saw a red station wagon with untinted windows stopped by other squad cars. The man who exited that station wagon did not match the description of the suspect. Hartman was then ordered to report to N.R.'s house, where he spoke with N.R. and her mother.

At about 4:10 p.m., Hartman received a radio transmission from a Berwyn squad car involved in the chase with defendant. Hartman joined the chase and eventually saw defendant's red station wagon pulled over to the side of the road and surrounded by police cars. Defendant was placed into custody and his car was towed to the police station. B.C.'s boots and underwear were not found inside defendant's car.

Later that evening, N.R. was brought to the police station, where she identified defendant's car as the red station wagon she had seen earlier. N.R. then viewed a lineup consisting of defendant and four other men. Defendant was in the number one position and was the only participant wearing a blue jacket. Each participant was required to say "Your mother sent me to pick you up." Initially, N.R. was unable to make an identification. She thought the man in the number one position was the man she had seen, but did not pick him because "there [were] a whole bunch of bruises on his face" that she had not seen before. N.R. left the viewing room and told her mother that she thought the man she had seen was in the number one position. At her mother's request, she was allowed to view the lineup a second time, and she then identified defendant.

At 9:30 p.m. that same evening, both B.C. and her sister identified defendant's car. B.C. viewed a five-man lineup in which the participants were required to say "I'll poke your eyes out and smash your head in." Again, defendant was the only participant wearing a blue jacket. B.C. identified defendant as the man who abducted her. According to one Berwyn police officer, B.C. viewed the lineup three times before she identified defendant.

Arlene Hall, a forensic serologist with the Illinois State Police, gave expert testimony regarding the physical evidence recovered from

defendant's and B.C.'s clothing and from inside defendant's car. Hall testified that a hair recovered from the rear floor of defendant's car was consistent with B.C.'s head hair standard and not consistent with defendant's head hair standard; a hair recovered from B.C.'s jacket and another hair recovered from her pants were each consistent with defendant's head hair standard and not consistent with B.C.'s head hair standard; and a hair recovered from defendant's jacket was consistent with B.C.'s head hair standard and not consistent with defendant's head hair standard. Hall testified that with the "proper" hair standards, she could determine "a possible donor of that hair" and that if the hair did not come from a particular person, she could "exclude that individual as a possible source in the majority of cases." Hall admitted that she could not say whether any hair found in defendant's car was B.C.'s hair, only that it could have been B.C.'s.

Hall also testified that B.C. was type two/one in the esterase D blood grouping and type O in the ABO blood grouping. Defendant was type one in the esterase D blood grouping and type A in the ABO blood grouping. Twenty-one percent of the white population in the United States are type two/one in the esterase D blood grouping. Hall testified that a bloodstain found inside the lower right front portion of the shirt defendant was wearing at the time of his arrest was type two/one in the esterase D blood grouping, which meant that the blood was not defendant's and was "consistent with the [B.C.'s] standard." Hall testified that bloodstains found on B.C.'s pants were also consistent with B.C.'s blood type. During closing arguments, the prosecutor characterized the blood and hair sample evidence as "damning" evidence that was the "lynch-pin" in the State's case.

After the jury returned verdicts of guilty, an "incident" occurred which prompted the trial judge to clear the court room and "order" the prosecutors to charge defendant with attempted murder. Defendant subsequently filed a motion in the trial court for substitution of judges, but that motion, heard by the same judge that presided over the trial, was denied. The trial court then heard arguments in aggravation and mitigation and sentenced defendant to concurrent terms of imprisonment for aggravated criminal sexual assault, criminal sexual assault, aggravated kidnapping, and attempted aggravated kidnapping.

I

Defendant maintains first that the hair and blood comparison evidence was improperly admitted at trial and improperly characterized by the State during closing arguments. Defendant argues that the

physical evidence merely put him and B.C. "in a large category of possible donors" of the hair and bloodstains found and, therefore, had no probative value as to the identification of the donors. Defendant cites several recent appellate court decisions calling into question the propriety of hair and blood comparison evidence where the prosecution overemphasizes the significance of that evidence.

Evidence is considered relevant where the circumstance or fact offered tends to prove or disprove a disputed fact or render the matter in issue more or less probable. (*People v. Schulz* (1987), 154 Ill. App. 3d 358, 366, 506 N.E.2d 1343.) Evidence of hair or blood found at a crime scene may be admitted, with appropriate foundation, even though its probative value standing alone is not considerable. (*People v. Johnson* (1976), 37 Ill. App. 3d 328, 332, 345 N.E.2d 531.) However, additional corroborating evidence or supporting information is generally required as a basis for admissibility. See *People v. Schulz*, 154 Ill. App. 3d at 364-65, 506 N.E.2d 1343; *People v. Mann* (1975), 30 Ill. App. 3d 508, 333 N.E.2d 467.

In this case, defendant has waived any issue regarding the admission of blood and hair comparison evidence by failing to object at trial. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) The record reflects that defendant objected only to the form of the questions asked regarding the evidence, not to the admission of the evidence. Given the overwhelming evidence of defendant's guilt presented at trial, the issue need not be addressed under the plain error rule. 107 Ill. 2d R. 615(a).

Even if the issue had not been waived, defendant's contention is without merit. The blood comparison evidence was properly admitted because it derived its relevance from the differences in the blood types of defendant and B.C. and the presence of B.C.'s blood type on defendant's clothing. (See *People v. Johnson*, 37 Ill. App. 3d at 332, 345 N.E.2d 531.) Although the evidence merely placed B.C. in a category of possible donors, it also excluded defendant as the source of the bloodstain found on his shirt. Also, other evidence was presented at trial showing that B.C. was bleeding as a result of the assault; that B.C. identified defendant as her attacker; that B.C. identified defendant's car; and that the location of the bloodstain is consistent with defendant having committed the assault. Under these circumstances, the blood comparison evidence was properly admitted.

The hair comparison evidence was also properly admitted because other factors were present that narrowed the categories of possible donors. Specifically, the category of possible donors for the hair found on B.C.'s clothing was narrowed considerably, not only by

B.C.'s identification of defendant as her attacker, but also by her testimony that she was assaulted in defendant's red station wagon. That same evidence narrowed the category of possible donors for the hairs found on defendant's clothing and in defendant's car.

Finally, the prosecutor did not improperly characterize the physical evidence during closing arguments. Prosecutors are generally permitted wide latitude in their closing arguments, although their comments must be based on the evidence or on reasonable inferences drawn therefrom. (*People v. Terry* (1984), 99 Ill. 2d 508, 460 N.E.2d 746.) Improper comments during closing argument do not warrant reversal unless the argument as a whole was so seriously prejudicial that it deprived the defendant of a fair trial. *People v. Cunningham* (1984), 130 Ill. App. 3d 254, 266, 473 N.E.2d 506.

In this case, the prosecutor described the hair and blood comparison evidence as "damning" evidence that was the "lynch-pin" in the State's case. Although this characterization is exaggerated, it was not seriously prejudicial. The prosecutor explained to the jury that because the hair standards were consistent, it was possible that the hair found on B.C.'s clothing was defendant's hair. Regarding the blood comparison evidence, the prosecutor stated that "[t]he blood was comparable and consistent with that of the victim." These remarks qualified the characterization of the evidence as "damning" and as the "lynch-pin" in the case. Moreover, the jury was instructed regarding the purpose of closing arguments. (See *People v. Jones* (1988), 123 Ill. 2d 387, 411-12, 528 N.E.2d 648.) Accordingly, the prosecutor's argument as a whole was not so seriously prejudicial as to deprive defendant of a fair trial.

## II

Defendant maintains that he was denied a fair trial because the trial court refused to allow him to recall B.C. for the purpose of laying a foundation for impeachment with a prior inconsistent statement. Defendant argues that, because B.C. testified at trial that she was lying on her stomach when she was assaulted, she would have been "severely" impeached by her prior statement to the police that she was turned over onto her back before she was assaulted. We disagree.

Before a witness may be impeached with a prior inconsistent statement, a proper foundation must be laid on cross-examination by directing the witness' attention to the time, place, and other circumstances of the statement to prevent unfair surprise and to give the witness the opportunity to explain the statement. (*People v. Henry* (1970), 47 Ill. 2d 312, 321, 265 N.E.2d 876.) If a party fails to lay such

a foundation on cross-examination, it is within the discretion of the trial court to permit the witness to be recalled for the purpose of perfecting the foundation. *People v. Henry*, 47 Ill. 2d at 322, 265 N.E.2d 876; *People v. Smith* (1986), 149 Ill. App. 3d 145, 152, 500 N.E.2d 605.

In this case, after B.C. had testified, defense counsel sought to elicit testimony from a police officer on cross-examination that, as stated in his police report, B.C. had told another police officer that she was turned over on her back before she was assaulted. The State objected on the ground that no proper foundation had been laid. Defense counsel indicated that he did not confront B.C. with the statement because of her "tender years" and the possibility that his client would be adversely affected if B.C. were to become upset on the witness stand. The trial court stated that it did not believe defense counsel's reasons were "legitimate," and defense counsel then requested leave to recall B.C. for the purpose of laying the foundation. The request was denied, and the State's objection to the cross-examination of the police officer was sustained.

■ Contrary to defendant's assertion, we do not believe that B.C.'s prior statement that she was turned over on her back would have severely impeached her credibility as a witness, her identification of defendant's car, or her lineup identification of defendant. Moreover, any evidence that B.C. was on her back would not have contradicted other evidence that she was sexually assaulted. Accordingly, we do not believe the trial court abused its discretion in refusing to recall B.C. for the purpose of allowing defense counsel to confront her with her prior statement.

### III

Defendant maintains that his convictions must be reversed because a police officer testified that B.C.'s sister identified defendant's car as the car driven by the man who abducted her sister. Defendant argues that the admission of this evidence violated his confrontation rights because B.C.'s sister did not testify and could not be cross-examined regarding her out-of-court statement.

■ We hold that any error in the admission of the police officer's testimony was harmless. B.C. identified defendant as the man who assaulted her; blood and hair comparison evidence was consistent with defendant having committed the crime; and B.C. identified defendant's car as the car in which she was assaulted. Moreover, the State did not exploit the hearsay testimony at issue during closing argument. (See *People v. Lopez* (1987), 152 Ill. App. 3d 667, 504 N.E.2d

862.) Under these circumstances, there is no reasonable probability that the jury would have acquitted defendant had the evidence been excluded.

## IV

Defendant maintains that his due process rights were violated by the instruction to the jury to return a general verdict on the aggravated criminal sexual assault charges in the indictment. Defendant notes that as a general proposition, a general verdict must be set aside if the trier of fact could rely on two or more independent grounds to convict the defendant, and one of those grounds is insufficient as a matter of law or fact. Defendant then argues that because the indictment alleged three separate acts of penetration, namely insertion of defendant's finger, contact with defendant's penis, and insertion of an object, and the jury was instructed that it could rely on any one of these three theories of penetration, the verdict must be set aside because there was no evidence to support the theories of penetration by defendant's finger or by an object.

However, defendant's argument is flawed because none of the grounds alleged in the indictment were insufficient as a matter of law or fact. Plainly, all of the alleged acts fall within the definition of "sexual penetration" (see Ill. Rev. Stat. 1987, ch. 38, par. 12—12(f)), so that none of the charges were insufficient as a matter of law. Moreover, because the type of penetration need not be proved at trial, and, if alleged in the indictment, is mere surplusage (see *People v. Tanner* (1986), 142 Ill. App. 3d 165, 491 N.E.2d 776), the jury could not have based its verdict on a charge for which there was insufficient proof to sustain a conviction.

## V

Defendant maintains that both the criminal sexual assault statute (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(1)), and the aggravated criminal sexual assault statute (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(b)(1)), are unconstitutionally overbroad because they punish innocent, as well as culpable, conduct. Defendant also claims that the aggravated criminal sexual assault statute violates due process, because aggravated criminal sexual assault is a Class X felony but the statute does not set forth a specific mental state for the offense, whereas aggravated criminal sexual abuse is a Class 2 felony which requires proof of an intentional or knowing touching for the purpose of sexual gratification or arousal. Although defendant's argument is unclear, he seems to suggest that the lack of a specific mental state in

the aggravated criminal sexual assault provision makes that offense less culpable than aggravated criminal sexual abuse, so that the punishments are not constitutionally proportionate. Finally, relying on *People v. Johnson* (1986), 114 Ill. 2d 69, 499 N.E.2d 470, defendant maintains that the aggravated criminal sexual assault statute violates due process because criminal sexual assault is not an underlying offense.

Criminal sexual assault is defined as "an act of sexual penetration by the use of force or threat of force. " (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a).) Neither the statutory definitions of "sexual penetration" and "force or threat of force" (see Ill. Rev. Stat. 1987, ch. 38, pars. 12—12(d), (f)) nor any other provision of the aggravated criminal sexual assault statute contains a specific mental state. The aggravated criminal sexual abuse statute, by contrast, requires a showing that the conduct was committed for the purpose of sexual gratification or arousal of the victim or the accused. See Ill. Rev. Stat. 1987, ch. 38, par. 12—12(e).

Nevertheless, neither the criminal sexual assault statute nor the aggravated criminal sexual assault statute is unconstitutional on the ground that it punishes innocent behavior because it does not define a mental state. The mental states of intent, knowledge, or recklessness are implied for those offenses involving "sexual penetration" for which no mental state is expressly set forth. (See *People v. Ortiz* (1987), 155 Ill. App. 3d 786, 508 N.E.2d 490; *People v. Bartay* (1986), 150 Ill. App. 3d 130, 501 N.E.2d 364; *People v. Burmeister* (1986), 147 Ill. App. 3d 218, 497 N.E.2d 1212; Ill. Rev. Stat. 1987, ch. 38, par. 4—3(b).) Accordingly, the statutes require some degree of culpability and do not punish innocent behavior.

*People v. Burmeister* (1986), 147 Ill. App. 3d 218, 497 N.E.2d 1212, squarely rejected the same argument made by defendant here that the aggravated criminal sexual assault statute violates due process on the ground that it does not expressly set forth a mental state, yet punishes conduct more severely than the aggravated criminal sexual abuse statute, which does define a mental state. That case was correctly decided, because there is no anomaly, as defendant suggests, between the conduct encompassed by the two offenses and the respective punishments. Aggravated criminal sexual assault is plainly a more culpable offense than aggravated criminal sexual abuse, because "sexual penetration" is more heinous behavior than "sexual conduct" as defined in the statutes. (See *People v. Bartay*, 150 Ill. App. 3d at 132.) Moreover, defendant's argument that aggravated criminal sexual assault is less culpable than aggravated criminal sexual abuse because

the former offense does not require proof of a mental state fails because, as noted above, a mental state of intent, knowledge, or recklessness is implied in the aggravated criminal sexual assault statute.

Finally, defendant argues that section 12—14(b)(1) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(b)(1)) violates due process because it defines an aggravated criminal sexual assault offense but does not include criminal sexual assault as an underlying offense. A similar argument prevailed in *People v. Johnson* (1986), 114 Ill. 2d 69, 499 N.E.2d 470, where the supreme court struck down the aggravated arson statute (Ill. Rev. Stat. 1983, ch. 38, par. 20—1.1). Like the aggravated arson statute at issue in *Johnson*, "by its very name" section 12—14 "refers to *** an aggravated offense" (see *People v. Johnson*, 114 Ill. 2d at 72), but section 12—14(b)(1) fails to define an underlying offense. Specifically, the element of "force or threat of force" is lacking in section 12—14(b)(1), so that the underlying conduct aggravated by the ages of the victim and the accused is merely "sexual penetration."

*Johnson*, however, is distinguishable on the ground that the legislature did not intend for section 12—14(b)(1) to aggravate the offense of criminal sexual assault, but rather intended to create a separate offense based on the ages of the victim and the accused. The section is plainly aimed at criminalizing sexual offenses against young victims without requiring proof that force was used or threatened. Though we consider the statute valid, we need not address the issue of the constitutionality of section 12—14(b)(1) because, as discussed further below, the record reflects that all convictions for aggravated criminal sexual assault in this case were merged, defendant was sentenced only under section 12—14(a)(2), and he was properly sentenced to an extended term based on his prior convictions for rape and indecent liberties with a child.

## VI

Defendant maintains that the trial judge erred in not transferring his motion for substitution of judges to a different judge for disposition and then erred in denying the motion. Defendant argues that he was entitled to have a different judge preside at sentencing because an "incident" occurred after the jury returned its verdict, causing the trial judge to clear the courtroom and "order" the prosecutors to file attempted murder charges against defendant. The trial judge's remarks, defendant argues, demonstrated that he could not be impartial at sentencing.

A motion for substitution of judges must be heard as soon as

possible after it is filed by a judge not named in the motion. (Ill. Rev. Stat. 1987, ch. 38, par. 114—5(d).) However, in this case, defendant did not object to the trial judge ruling on the motion. Accordingly, defendant has waived this issue on appeal. See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

■ In any event, the motion was properly denied. A defendant moving for substitution of judges has the burden of proving prejudice on the part of the judge he seeks to disqualify. (*People v. Dunigan* (1981), 96 Ill. App. 3d 799, 421 N.E.2d 1319.) A trial judge will not be presumed impartial because of an attack or provocation by the defendant on court officials. See *People v. Hall* (1986), 114 Ill. 2d 376, 499 N.E.2d 1335.

In this case, an "incident" occurred which caused the trial judge to clear the courtroom and "order" the prosecutors to charge defendant with attempted murder. Nothing in the record indicates what prompted the trial judge's actions or remarks. In denying defendant's motion for substitution of judges, the trial judge stated that he had considered defendant's motion during the three weeks preceding the hearing on the motion and decided that "in [his] heart and in [his] mind" he "could give a fair sentencing hearing on aggravation and mitigation." Given the necessity for us to speculate regarding what happened in the courtroom and the trial judge's assurances that he was not affected by the incident, and considering the Illinois Supreme Court's admonition that requiring a substitution of judges under circumstances provoked by the defendant "would invite misconduct" (see *People v. Hall*, 114 Ill. 2d at 407), we conclude that defendant's motion was properly denied.

## VII

Defendant maintains that he was advised by the court that a guilty plea would result in a 30-year prison term. He asserts that a 60-year sentence was imposed as punishment for rejecting that offer and exercising his right to a jury trial. Defendant also asserts that the 60-year extended-term sentence was a result of improper double enhancement, because the trial court commented on the ages of the victims in imposing an extended term, even though the ages of the victims were elements of the offenses for which defendant was convicted. Finally, defendant maintains that, with the exception of the offense against N.R., his convictions were all based on the single act of sexually assaulting B.C. Defendant argues that all but one of the aggravated criminal · sexual assault convictions must be vacated; the criminal sexual assault conviction and sentence must be vacated; and

"one aggravated kidnapping conviction" must be vacated. Defendant argues that resentencing is then required, because the sentence imposed might have been influenced by the improper convictions. We agree only that the criminal sexual assault conviction and sentence must be vacated.

Nothing in the record suggests that defendant received a more severe sentence as punishment for going to trial. Because such evidence must be clearly reflected in the record (see *People v. Perry* (1971), 47 Ill. 2d 402, 408, 266 N.E.2d 330), defendant's first contention is without merit.

■■ Defendant's double enhancement argument is likewise without merit. The record reflects that defendant was given an extended term because of the violent nature of the crime against B.C. and his convictions in 1981 for rape and indecent liberties with a child, not because of the ages of the victims. In any event, as noted above, the transcript of the sentencing hearing reflects that the trial court merged all aggravated criminal sexual assault counts and imposed a single extended term of 60 years' imprisonment under section 12—14(a)(2), not section 12—14(b)(1). Defendant's double-counting argument is not applicable to section 12—14(a)(2), because the age of the victim is not an element of offense defined in that section.

■■ We agree that only one conviction for aggravated criminal sexual assault is proper in this case. However, we do not believe that improper multiple convictions for aggravated criminal sexual assault were considered at sentencing, because the trial court indicated that all such convictions were merged and imposed a single sentence under section 12—14(a)(2). Because the written sentencing order reflects a conviction and sentence on five counts of aggravated criminal sexual assault under section 12—14(a)(2), we direct the trial court on remand to correct that order to reflect a single conviction for aggravated criminal sexual assault under section 12—14(a)(2).

■■ We also agree that defendant's criminal sexual assault conviction should be vacated. Although defendant was charged and found guilty under sections 12—14(a)(2) through (a)(4) and section 12—14(b)(1), again the record reflects that all convictions for aggravated criminal sexual assault were merged into a single conviction under section 12—14(a)(2). Because criminal sexual assault is a lesser included offense of aggravated criminal sexual assault defined in section 12—14(a)(2) (see *People v. Boyer* (1985), 138 Ill. App. 3d 16, 485 N.E.2d 460), defendant's conviction for criminal sexual assault must be vacated.

■■ However, we do not believe resentencing is required on the

ground that the trial court might have considered the criminal sexual assault conviction in imposing sentence for defendant's other convictions. Nothing in the record suggests that defendant's sentence for aggravated criminal sexual assault was influenced by the conviction for criminal sexual assault. As noted above, defendant received an extended term for aggravated criminal sexual assault because of the nature of the offense and because of his prior convictions for rape and indecent liberties with a child. There is likewise no indication in the record that defendant's sentence for the kidnapping offenses was influenced by the criminal sexual assault conviction.

 Finally, with respect to the kidnapping convictions, the record reflects that defendant was found guilty of aggravated kidnapping based on kidnapping during the course of the commission of a felony (see Ill. Rev. Stat. 1987, ch. 38, par. 10—2(a)(3), and also based on the victim's age (see Ill. Rev. Stat. 1987, ch. 38, par. 10—2(a)(2)). It appears, however, that judgment was entered on only one count of aggravated kidnapping, and defendant received a single sentence of 15 years' imprisonment for that offense. That conviction need not be vacated because the sexual offense for which defendant was sentenced was not enhanced by the kidnapping (see *People v. McDarrah* (1988), 175 Ill. App. 3d 284, 529 N.E.2d 808), and the evidence adduced at trial supports a conviction for aggravated kidnapping as well as a conviction for aggravated criminal sexual assault (see *People v. Hines* (1988), 165 Ill. App. 3d 289, 518 N.E.2d 1362).

## VIII

Defendant's last contention is that any issue deemed waived must nevertheless be considered on its merits because defense counsel's failure to preserve an issue that has merit constituted ineffective assistance of counsel. We consider this argument as a claim of ineffective assistance of counsel based on defense counsel's failure to preserve certain issues for review.

 The only issues on this appeal that defense counsel failed to preserve are the issues regarding the admission of blood and hair comparison evidence and the failure of the trial court to transfer the motion for substitution of judges. Applying the standard set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and given that the hair and blood comparison evidence was properly admitted and the motion for substitution of judges was properly denied, it cannot be said that defense counsel's failure to object in either instance was constitutionally deficient or, if the objections had been made, the outcome of the case would have been different.

For the foregoing reasons, we affirm the conviction and sentence for aggravated criminal sexual assault under section 12—14(a)(2), affirm the convictions and sentences for aggravated kidnapping and attempted kidnapping, and vacate the conviction for criminal sexual assault. We remand for the limited purpose of correcting the written sentencing order.

Affirmed in part; vacated in part, and remanded.

BILANDIC, P.J., and HARTMAN, J., concur.