THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIE HARPER, Defendant-Appellant.

First District (6th Division) No. 1—90—1235

Opinion filed September 17, 1993.

Rita A. Fry, Public Defender, of Chicago (Kyle Wesendorf, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and Latisha Foster, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

A jury convicted the defendant, Willie Harper, of aggravated criminal sexual assault and armed robbery. He was sentenced to concurrent terms of 20 years' imprisonment on each charge. He contends that trial errors require a new trial. He does not question the sufficiency of the evidence.

A.L., the victim, left her home in Chicago Heights at approximately 10:40 p.m. on May 22, 1989, and walked toward Wentworth Avenue, where there was a large amount of drug traffic. She was looking for her brother, who had been recently released from a drug rehabilitation program. She was 20 years old and lived with her parents.

As she walked toward Wentworth Avenue she saw a man she later identified as the defendant standing near a gate in front of a house. She had never seen him before. He was wearing colorful print shorts and a net-type tank top. She could see him well because there was a streetlight by the house. When she saw him, she crossed to the other side of the street to get away from him. She was watching him while she crossed the street and saw him turn toward her. He began walking toward her and said, "I got a package[, h]ow much money you got." She told him she did not take drugs and continued watching him. He was directly under a streetlight when he asked her about buying drugs. She began backing away from him, but he "started coming steady walking towards [her]"; she eventually turned and started to run away from him as he chased her.

He caught her near a community center a short distance from the house where she had originally seen him and "put something sharp to [her] neck." She began screaming, but he told her he would "cut" her if she was not quiet. He asked her if she had any money, and she took $5 from her jacket pocket and gave it to him. He reached into her pocket and took out some coins. He dragged her around the community center building, through several fence openings, and took her to a nearby wooded area. While dragging and pushing her toward the wooded area, he told her to duck her head down toward the ground whenever they heard noises. Each time she ducked, they "were close and his head would look around" toward her. Her face was only a few inches from his and she could see his hair and the scar on his nose. She noticed the scar, his moustache and goatee and his "Bronx" style haircut.

In the wooded area, he told her to remove her clothes, and he took off his clothes. She believed that he was under the influence of drugs at the time because of the appearance of his eyes. He then forced her to have oral and vaginal sex with him. She "was just hysterical by that point," and when he allowed her to get up from the ground, she dressed, leaving her underwear on the ground, and ran home. Her underwear was later recovered in the wooded area.

A.L. ran up the stairs to her house screaming and crying; her mother asked her what had happened. According to both A.L. and her mother, who also testified, A.L. told her mother that she had been raped, that she did not know the rapist, but that she could identify him if she heard his voice or saw his face. Her mother called the police.

Police officers Rice and Garcia arrived at A.L.'s house early in the morning of May 23, 1989, and took her to the wooded area and then to the hospital. She gave the police a description of the defendant's clothes and voice and told them that she "could describe him on his voice alone." She also talked to the police at the hospital. She talked to Rice and Garcia approximately one hour after the incident, and although she was "halfway calmed down," she was "not completely" composed but told the officers about the defendant "the best way [she] could that night." She explained that she did not tell the officers "a whole lot of things" during the initial interview. She could not remember if she told them about the defendant's nose scar, but she believed she told them about the defendant's hair cut, moustache and goatee.

After she left the hospital, A.L. went to the police station and talked to Detective Pinnow. She did not tell Pinnow her attacker had a scar on his face, but she told him she could identify him by hearing his voice or seeing his face. She described his shorts and shirt, and stated that he was black, had a Bronx haircut, was 26 or 27 years old, and had a husky, solid build. She looked through three or four "mug books" but did not select any individual as her attacker. She did choose facial features from an "Ident-A-Kit" used to make composite sketches in an attempt to make a picture of the defendant. She was not satisfied with the resulting sketch, although she believed Pinnow took a picture of it.

Pinnow told her to call the station if she remembered anything more, and on the following day, A.L. called Pinnow and told him that the rapist had a scar on his nose and that the sketch was not accurate. She explained that she remembered to tell the police

about the scar on the following day because she had been able to sleep and thus was calmer and thinking more clearly.

Detective Bohlen came to her house and showed her a strip of 12 pictures of black men. She knew two of the men pictured from the neighborhood and eliminated them from consideration. She identified the defendant as her attacker from a picture in the strip.

On June 6, A.L. and her sister were driving on Wentworth Avenue when A.L. saw Harper walking on the street. She told her sister, "That's him[, t]hat's the guy right there." She saw a man she knew named Bickham standing at the corner, and she asked Bickham to watch the defendant. She and her sister drove home to get their father. When she and her father and brother returned to Wentworth Avenue, the defendant was gone.

Later that day a man from the neighborhood came to the house and told A.L.'s uncle that "the guy [they] were looking for" was on Wallace Avenue. She and her family drove to Wallace Avenue, where A.L. saw the defendant standing on a corner. She then drove to the police station. Her uncle left the car to alert the police, and A.L. drove back toward Wallace Avenue. When she approached the defendant again, he ran through a yard in a direction away from the police station, and A.L. saw the police arrest and handcuff him a few blocks from Wallace Avenue. She later identified the defendant from a lineup of five people held by Detectives Bohlen and Pinnow at the police station. The defendant had a goatee, a moustache, a Bronx haircut and a scar on his nose.

Detective Pinnow testified that A.L. and her mother came to the police station on May 24 to tell him that her attacker had a scar on his nose. She never told them that the man had a moustache or goatee. He also testified that she was shown a strip of 12 pictures and that she picked out a picture of the defendant.

When the defendant was arrested on June 6, 1989, he agreed to talk to Pinnow and Bohlen after being advised of his *Miranda* rights. He told Pinnow that he was in a drug rehabilitation center on May 22, 1989. The detectives investigated and determined that the defendant was not at the center on May 22. The defendant then told them he was either at his father's house or his sister's house on May 22.

Jenny Hahn, a forensic scientist employed by the State Police Forensic Laboratory, examined blood and pubic hair samples from the defendant and A.L., and semen from swabs of A.L.'s mouth and vagina taken at the hospital and from A.L.'s clothes. Hahn found three pubic hairs in the sample from A.L. that were not con-

sistent with A.L.'s hair. Two of those three hairs were not consistent with the defendant's hair, and in her opinion came from a third person. The other "unknown" hair, however, had characteristics similar to the defendant's hair and had no characteristics that were "markedly different" from the defendant's hair. Therefore, Hahn could not rule out the defendant as the source of the unknown hair, although she could not definitely say that the hair came from the defendant.

Hahn also testified that the "high concentration" of semen on the vaginal swab and on A.L.'s pants was consistent with the defendant's blood. Therefore, Hahn concluded that the semen found on the vaginal swab and A.L.'s pants could have come from the defendant. Since there was a high concentration to analyze, Hahn was able to conclude, after several calculations that she outlined for the jury, that 4.2% of the United States black male population could have left the semen type on the vaginal swab and 3.1% of the United States black male population could have left the semen type found on A.L.'s pants.

The defense was an alibi. The defendant's mother, Josephine Harper, testified that on May 22, 1989, the family held a church choir cookout at her daughter's home. The defendant attended the cookout, which began at approximately 5 p.m., with his girlfriend, Terri Baker. The defendant was upstairs watching a basketball game with other men until approximately 10:30 p.m. She testified that when the defendant left the cookout, he was with his girlfriend, his sister Brenda Carrell and her boyfriend Robert Davis. She next saw the defendant when he returned to her house in the "latter part of the morning" on May 23, 1989. The defendant's sister, Bobbie Bell, testified substantially the same as her mother.

The defendant's other sister, Brenda Carrell, and his girlfriend, Terry Baker, both testified. They said that they left the cookout in Baker's father's car with Robert Davis and the defendant at approximately 10:30 p.m. Baker said that, during the cookout, the defendant was upstairs with the other men and did not leave the house before 10:30 p.m. The group drove into Chicago; Davis was driving. Carrell explained that the purpose of the trip was for Davis to obtain money from a friend in Chicago.

Both women testified that the tire on the car became damaged on an expressway, forcing the group to pull off the highway, take the car to a gas station, and then slowly drive the car away from that gas station to a different gas station. They left the car at the gas station, walked to the "el," took the el to the bus station at

95th Street, and then took a bus to 127th Street. They obtained a ride home when Davis flagged down a car and offered the driver money to take them back to Chicago Heights. It was after 6 a.m. the following morning when they returned to Chicago Heights, and the driver took Davis and Carrell to Bell's house and Baker and the defendant to the defendant's mother's house.

Robert Davis also testified for the defendant. He admitted having three felony convictions, including a 1984 conviction for voluntary manslaughter. He testified that during the cookout the men were watching a Bulls game upstairs, and he later stated the game was between the Bulls and the Detroit Pistons. He could not remember exactly what time most events of the evening occurred, and could not be sure exactly what day of the week May 22 was but assumed it was a Sunday. (May 22, 1989, was a Monday.) He did not remember telling State's Attorney Investigator Dwayne Holbrook the cookout was on a Saturday. Investigator Holbrook later testified that Davis did tell him the cookout was on a Saturday.

Davis testified that the group left Bell's at approximately 11 p.m. and had car tire trouble on the expressway. He first explained that the group took the el, then got a ride from a friend to the bus station at 95th Street. They took a bus to 127th Street, where he flagged down a car and paid the driver to take them back to Chicago Heights. On cross-examination he said that the group walked to the el station, but did not take the el. When asked about this inconsistency with his direct examination testimony, Davis said, "I don't even remember that far back." Also on cross-examination, Davis said that the men watched several basketball games and that they did not necessarily watch the Bulls. When the prosecutor asked him about his earlier testimony regarding the Bulls game, Davis said, "[O]nly speculation you could be correct *** I don't have total recall."

The defendant first contends that reversible hearsay evidence was introduced during the testimony of A.L. She testified that she saw the defendant walking up Wentworth Avenue. She drove up to the corner and saw Bickham. She told Bickham, "That's the guy. That's the one who raped me. Watch and see where he go[es]."

A.L. testified that she went home to get her father, spoke with her father and brother and that they went back to Wentworth Avenue. The defendant was gone. She then testified as follows:

"STATE'S ATTORNEY: What was is—after you looked for him there, what was it that you *did* then?

A. The guy that I asked to keep an eye on him, he said he knew him.

DEFENSE ATTORNEY: Objection, Your Honor. Hearsay.

STATE'S ATTORNEY: Listen to my question. After you didn't see him, *did* you go anywhere after that?

A. I went straight back to the guy, and I asked him where did he go, and he said—

DEFENSE ATTORNEY: Objection to what the person said.

THE JUDGE: Basis of what?

DEFENSE ATTORNEY: Hearsay.

THE JUDGE: That's overruled, counsel.

A. He said that he called him. He said 'Hey, Willie man, come here, and he said, "what man, what, man. I ain't did nothing," and ran into someone's house.' " (Emphasis added.)

The State now contends that the testimony of the conversation between Bickham and A.L. was used to show the effect Bickham's statement had on her. The State says that "the information which Bickham gave to A.L. was relevant to show why she could not find defendant and had to stop searching and return home." We are not persuaded of the tenability of the State's argument. What Bickham allegedly told A.L. could be considered evidence of a consciousness of guilt on the part of the defendant. Her subsequent action of going to the police station was not probative and could have been explained if she had simply testified that the defendant was gone or, at most, that Bickham told her he had gone.

■ We do not believe, however, that the evidence was prejudicial. We note first that the evidence came out in unresponsive answers by A.L. Second, this was a strong identification case which was substantially corroborated by scientific evidence. In addition, A.L.'s testimony itself established flight by the defendant just before he was arrested, and the police officer's testimony that the defendant made a false statement to him about his whereabouts at the time of the crime could be considered evidence of consciousness of guilt. Last, the trial judge made a strong statement to the jury that the evidence was not to be considered for the truth of the statement made by Bickham. Consequently, we find no reversible error in the admission of this testimony.

The defendant next contends that prejudicial error occurred during the cross-examination of the defense witnesses, Davis and Carrell. During her direct examination, Carrell explained that the only purpose Davis gave the group for going into Chicago was that

he needed to pick up money from a friend. On cross-examination she repeated that Davis told her and the others that Davis was going to pick up money. The following occurred:

> "STATE'S ATTORNEY: He of [*sic*] mention you guys weren't going into Chicago to pick up marijuana, were you?
>
> DEFENSE ATTORNEY: Objection, your Honor.
>
> STATE'S ATTORNEY: Judge, I can tie it up. I'll prove it up.
>
> THE JUDGE: Sustain."

After Carrell's testimony, the defense made a motion *in limine* to preclude the State from questioning Davis about the purpose of the trip into Chicago, arguing that the purpose was irrelevant to the alibi. The prosecutor said the evidence that the trip was to obtain marijuana was being offered only to impeach the testimony of the defense witnesses, including Carrell. The judge agreed to permit the prosecutor to ask Davis about the trip's purpose but the prosecutor could not tell Davis how to answer. The judge stated, "[I]f you want me to instruct the jury [the evidence] is to be used only for impeachment purposes, I will be glad to do it." The defense attorney did not ask for such an instruction but insisted that his motion *in limine* be granted; the judge denied the motion.

When Davis was being cross-examined, he admitted that he went into Chicago to purchase marijuana, but also explained repeatedly that the others did not know his true purpose. He stated, "This has nothing to do with [the defendant]" and noted, "[T]hey didn't know what I was going for." Again we do not find any prejudicial error. The defense opened the door to some extent by eliciting from Carrell evidence that the purpose of the trip was an innocent one; it would appear that if the prosecutors had evidence to the contrary, they should not be required to sit by without attempting to disabuse the fact finder of the impression created by Carrell's direct examination. It is the general rule, however, that impeachment must be relevant. We agree that the purpose of the trip to Chicago was not relevant, and the State should not have been permitted to bring out the fact that the purpose of the trip was to pick up marijuana. But again, we do not believe the evidence was prejudicial to the defendant. Evidence of narcotics was already in the record to a substantial degree. A.L. had testified that there was a large amount of drug traffic on Wentworth Avenue, that her own brother had recently been released from a drug rehabilitation program, and that the defendant appeared to be on drugs at the time of the crime. The defendant originally told Officer Pinnow that he

was in a drug rehabilitation center on the day of the offense. Most important, her testimony established that in her initial encounter with the defendant he was attempting to sell her narcotics. Additional evidence that Davis was going to buy marijuana could not have inflamed the jury. For these reasons, we hold that any error was harmless.

The defendant's last contention is that reversible error occurred during the State's closing argument. During rebuttal argument the prosecutor said:

"He knew they were looking for him, but he thought he got away with it. He didn't think he left any evidence. He didn't think his semen mattered. He didn't probably know he was a secretor. He didn't know he left a pubic hair."

A defense objection to the argument was overruled.

Before that argument was made, the prosecutor also made the following remarks, to which no objection was made:

"I submit to you, ladies and gentlemen, by listening to the forensic evidence that was presented in this case, this indicates that [the defendant] was with [A.L.] that night and had left these deposits. He left his concentration of semen and that *** is corroborative of the identification and the testimony of [A.L.]. He left the pubic hair *** [and e]very characteristic she observed was consistent, the unknown hair with the hair of [the defendant]. Corroborative evidence of what [A.L.] said."

We believe that the prosecutor's remarks to which the defendant objected were not improper. (See *People v. Turner* (1989), 128 Ill. 2d 540, 539 N.E.2d 1196; *People v. Jimenez* (1989), 191 Ill. App. 3d 13, 547 N.E.2d 616.) The case cited by the defendant, *People v. Linscott* (1991), 142 Ill. 2d 22, 566 N.E.2d 1355, is distinguishable. In that case, the prosecutor "made up" blood-analysis evidence that a vaginal swab indicated the victim could only have been raped by a nonsecretor, such as the defendant. (*Linscott,* 142 Ill. 2d at 37.) The prosecutor also "repeatedly" argued that hairs found near and on the victim's body were conclusively from the defendant, despite expert witness testimony that "you cannot say that this hair came from this individual, only *** that it's consistent." (*Linscott,* 142 Ill. 2d at 30.) The *Linscott* prosecutor made a mathematical prediction about the probability that any other man left the hairs, which the supreme court found was not from the expert witness' testimony and was "without foundation and *** patently inapplicable" to the case. Finally, the prosecutor stated sev-

eral times that the hair found at the scene "matched" the defendant's hair. (*Linscott*, 142 Ill. 2d at 33.) The supreme court reversed because of the misstatement of the blood-analysis evidence and the repeated misstatements indicating the hairs found conclusively were from the defendant, and that the misstatements were compounded by the erroneous mathematical prediction. In the case before us, the prosecutor's argument, to which an objection was made, was prefaced by the prosecutor's argument that the unknown hair was consistent with the pubic hair of the defendant. That argument was a correct description of the expert's testimony.

The defendant argues that reversible error occurred in the following closing argument by the State:

"STATE'S ATTORNEY: [To acquit the defendant y]ou have to believe that [A.L.] is completely lying about this.

DEFENSE ATTORNEY: Objection, your Honor.

JUDGE: Overruled.

STATE'S ATTORNEY: You have to believe there is no corroborative evidence. *** You have to believe that she is completely mistaken. That every time she took a look at this guy and put a finger to him that she was lying. Well, ladies and gentlemen, take a look into her eyes. She testified and stood here. Do you think she was mistaken? I submit to you, no way."

The defendant relies on *People v. Cole* (1980), 80 Ill. App. 3d 1105, 400 N.E.2d 931. In *Cole*, the prosecutor argued that, in order to acquit the defendant, the jury had to find that the complaining witness, three police witnesses and "the other witnesses of the State are lying." (*Cole*, 80 Ill. App. 3d at 1107.) The appellate court ordered a new trial on the ground that the State's argument was "such a misstatement of law as to prejudice defendant and deny him a fair trial," citing two cases from the Seventh Circuit Court of Appeals. (*Cole*, 80 Ill. App. 3d at 1108.) The court concluded that the jury could have believed that the complaining witness was telling the truth to the best of his recollection, but was merely mistaken when he identified the defendant.

The State cites *People v. Knott* (1991), 224 Ill. App. 3d 236, 586 N.E.2d 479, *appeal granted* (1992), 145 Ill. 2d 640, 596 N.E.2d 634, in which the defendant was identified as a robber by two witnesses. He presented an alibi witness who said the defendant was with him at the time the crime was committed. The prosecutor argued:

"[The alibi witness] isn't lying. *** [But c]ould he be ten minutes, fifteen minutes off? To believe [the alibi witness'] times,

okay, you have to totally disbelieve [the victims who identified the defendant]." *Knott*, 224 Ill. App. 3d at 256.

The *Knott* court discussed *Cole* and other cases, and stated "courts have distinguished cases where the 'contradiction could possibly be due to a witness' mistake, as opposed to when the contradiction was almost certainly due to a witness lying.'" (*Knott*, 224 Ill. App. 3d at 257, quoting *People v. Smith* (1991), 209 Ill. App. 3d 1043, 1051-52, 568 N.E.2d 482.) The court explained that "[t]he key is to review the comment in context," and distinguished *Cole* because the *Knott* prosecutor did not repeatedly tell the jury it must find the State witnesses lied, but qualified his statement by suggesting that the alibi witness was mistaken about the time. (*Knott*, 224 Ill. App. 3d at 258.) The *Knott* court held that the comments "did not rise to the level of prejudicial error." (*Knott*, 224 Ill. App. 3d at 258.) The court concluded by stating that, "[i]n any event, any error would be harmless where the jury was properly instructed that closing arguments are not evidence." *Knott*, 224 Ill. App. 3d at 258.

 The facts of this case are closer to *Knott* than to *Cole*. The prosecutor's remarks were equivocal in that he used both "lying" and "mistaken." The judge also instructed the jury that closing arguments are not evidence. But we believe there is a more compelling reason to reject the defendant's argument, and that is that we interpret the defense attorney's argument to be an attack on the credibility of A.L. To use some but not all the examples illustrating the defense attorney's questioning of A.L.'s credibility, he said that she was "familiar with drug dealers." He also said that she had exaggerated her emotional state when she first talked to the police. He pointed out what he said were contradictions between A.L.'s testimony and that of the police officers and alleged contradictions between A.L.'s testimony on direct and on cross-examination. For these reasons, we find no error in the prosecutor's closing argument.

 The defendant's last claim of error is that the judge improperly sustained several objections by the State during the defense's closing argument and at the same time the trial judge made improper comments on the evidence. The defendant has referred to five specific instances in which the judge sustained objections by the State on the ground that the evidence did not support the defense attorney's statements. It is clear to us that, in the five instances of which the defendant now complains, the defense argu-

56

ment was not based on the evidence or reasonable inferences from the evidence. We find no error in the judge's rulings or comments.

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.